

FILED
U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA
2003 JUL 29 PM 4: 47
SIOUX CITY DIV. OFFICE

| | |
|---|---|
| JAMES EISCHEID, | CASE NO:  C 00-4100  MWB |
| Plaintiff, | BY |
| vs. | |
| DOVER CONSTRUCTION, INC., and WOODS MASONRY, INC. | |
| Defendants, | |
| and | |
| DOVER CONSTRUCTION, INC., | |
| Third-Party Plaintiff, | **PLAINTIFF'S APPENDIX TO MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| WOODS MASONRY, INC., | |
| Third-Party Defendant. | |
| WOODS MASONRY, INC., | |
| Third-Party Plaintiff, | |
| vs. | |
| DELOSS CONSTRUCTION, INC., of Spencer, Iowa, | |
| Third-Party Defendant. | |

**COMES NOW** Plaintiff and submits the following Appendix in support of its Motion for

Summary Judgment filed against Dover Construction, Inc.:

# TABLE OF CONTENTS

DOCUMENT NAME                                          APPENDIX PAGE NO.

## PLEADINGS

1.  Plaintiff's Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-1

2.  Memorandum Opinion and Order Regarding Summary Judgement Motions
    Involving Claims by and Against Woods Masonry. . . . . . . . . . . . . . . . . . . . . .  A-6

## EXHIBITS

3.  Plan Drawings
    (Copy only of page 7, Exhibit #6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-12

4.  Standard Form Agreement Between Owner and Contractor
    (Deposition Exhibit #8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-13

5.  Sub-Contract Agreement between Dover and Woods
    (Deposition Exhibit #3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-19

6.  Sub-Contract Agreement between Dover and DeLoss
    (Deposition Exhibit #4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-21

7.  AIA Document A201-1997
    (Deposition Exhibit #9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-23

8.  Weather records for Spencer, Iowa re: 3/17/99 . . . . . . . . . . . . . . . . . . . . . . .  A-28

## EXPERT WITNESS DISCLOSURES

9.  Plaintiff's Expert Witness Disclosure for Todd Sirotiak  . . . . . . . . . . . . . . . .  A-32

10. Plaintiff's Expert Witness Disclosure for Marc Reitz  . . . . . . . . . . . . . . . . . .  A-51

## DEPOSITION TESTIMONY

11. Deposition of Derek Woods; Direct Examination by Attorney Steven J. Andreasen:
    Page 58, line 19 - page 60, line 10; page 114, line 1 - 10; page 149, line 15 - page
    150, line 24; page 159, line 8 - page 161, line 23; page 165, line 22 - page 167, line
    5; page 170, line 3 - page 171, line 6; page 192, line 11 - page 194, line 13  A-59

12. Deposition of Barry DeLoss; Direct Examination by Attorney Steven J. Andreasen: Page 141, line 13 - 24; page 144, line 9 - page 145, line 4; page 146, line 11 - 25; page 157, line 16 - page 158, line 15; page 173 line 5 - 13, line 25; page 176, line 17 - page 177 line 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-77

13. Deposition of Kevin Klausner; Direct Examination by Attorney Steven J. Andreasen: Page 28, line 3 - page 29, line 6; page 52, line 12 - page 54, line 9; page 56, line 15 - page 57, line 17; page 64, line 12 - page 65, line 7 . . . . . . . . . . . . . . . . . A-87

14. Deposition of Dave Cozza; Direct Examination by Attorney Steven J. Andreasen: Page 25, line 4 - page 26, line 1; page 49, line 15 - 24; page 55, line 3 - page 56, line 6; page 70, line 8 - 13; page 72, line 22 - page 73, line 20; page 81, line 11 - page 82, line 20; page 85, line 10 - 23; Re-Direct Examination by Attorney Andreasen: Page 93, line 4 - 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-97

**WILLIA, STAHLE & ANDREASEN, L.L.P.**

BY: _____

**N. RICHARD WILLIA, WO 0006016**
**STEVEN J. ANDREASEN, WO 0013577**
**501 Pierce Street, Suite 400**
**P.O. Box 1768**
**Sioux City, IA 51102**
**Phone:** (712) 277-0686
**FAX:** (712) 277-0687

**ATTORNEYS FOR PLAINTIFF**

COPY TO:

Stephen F. Avery *Mail*
407 Grand Avenue
P.O. Box 999
Spencer IA 51301-0999
ATTY: DeLoss Construction, Inc.

Matthew T. E. Early *Hand-deliver*
522 4th Street - #300
Sioux City IA 51101
ATTY: Woods Masonry, Inc.

John C. Gray *Hand-deliver*
701 Pierce Street - #200
P.O. Box 3086
Sioux City IA 51102
ATTY: Dover Construction, Inc.

Paul D. Lundberg          *Hand deliver*
600   4th Street - #906
Sioux City   IA  51101
ATTY:  Dover Construction, Inc.

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served
upon all parties to the above cause to each of the attorneys of record
herein at their respective addresses disclosed on the pleadings on

_____7 - 28 - 03_____.

BY:        ☒  U.S. Mail              ☐  FAX
           ☒  Hand Delivered         ☐  Overnight Courier
           ☐  Federal Express        ☐  Other:

4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| JAMES EISCHEID,<br><br>Plaintiff,<br><br>vs.<br><br>DOVER CONSTRUCTION, INC.,<br>an Illinois Corporation,<br><br>WOODS MASONRY, INC.,<br>an Arkansas Corporation;<br><br>and<br><br>OTIS, KOGLIN, WILSON<br>ARCHITECTS, INC. f/k/a<br>OTIS ASSOCIATES, INC.,<br>an Illinois Corporation,<br><br>Defendants. | CASE NO: C 00-4100 MWB<br><br>**PLAINTIFF'S<br>AMENDED COMPLAINT** |

## Count I

COMES NOW Plaintiff and in support of his cause of action against Defendant, Dover Construction, Inc. (hereinafter "Dover"), states:

1.  James Eischeid is a resident of Spencer, Clay County, Iowa.

2.  At all times material hereto, Dover was an Illinois Corporation doing business in the State of Iowa and was engaged in the business of building construction.

3.  At all times material hereto, Woods Masonry, Inc. was an Arkansas Corporation doing business in the State of Iowa and was sub-contracted by Dover to do construction work as hereinafter described.

4.  On or about March 17, 1999, James Eischeid was an employee of and

1

A - 1

working within the scope and course of his employment with Woods Masonry, Inc.

5. On or about March 17, 1999, James Eischeid was working upon premises located at 700 11th Street SW in Spencer, Clay County, Iowa; said premises being the location of a building being constructed by Dover.

6. On or about March 17, 1999, Dover was responsible for providing James Eischeid with a safe place to work.

7. On or about March 17, 1999, Dover was in charge and control of the design and performance of said construction work at said premises and, thus, were responsible for this site to be a safe work site for those persons working thereon.

8. On or about March 17, 1999, while in the scope and course of his employment, James Eischeid fell with great force and was struck on his body by construction materials sustaining severe and permanent injuries. Said injuries were sustained at the construction site described above.

10. At said time and place, Dover failed to provide a safe work site for workers such as James Eischeid.

11. At said time and place, Dover was otherwise negligent in performing the construction work at said site.

12. As a direct and proximate result of the negligence of Dover and its failure to provide a safe work site, James Eischeid sustained serious injuries, permanent in nature, and has incurred and will in the future incur damages, including but not limited to: Doctor, Hospital, and related medical expenses; lost wages; a reduction in earning capacity; disability; and, pain and suffering.

A - 2

## Jurisdiction

13.  James Eischeid is a resident of the State of Iowa.

14.  Dover is a resident of the State of Illinois pursuant to 28 U.S.C. §1332(c).

15.  The amount of damages sustained by James Eischeid, exclusive of interest and costs, exceeds the sum or value of $75,000.00.

WHEREFORE, James Eischeid prays for judgment against Dover in a sum such that will fully and fairly compensate him for injuries and damages sustained, along with interest as provided by law; the costs of this action; and, any other relief to which the Court deems him entitled.

## Count II

COMES NOW Plaintiff and in support of his cause of action against Defendant, Woods Masonry, Inc. (hereinafter "Woods"), states:

16.  Paragraphs #1 through #15, inclusive of Count I above, are incorporated herein by reference.

17.  On or about March 17, 1999, Woods, by and through its employees, was performing construction work on the premises described above.

18.  At said time and place, Woods was negligent in the performance of its construction work.

19.  As a direct and proximate result of the negligence of Woods, James Eischeid sustained serious injuries, permanent in nature, and has incurred and will in the future incur damages, including but not limited to: Doctor, hospital, and related medical expenses; lost wages; a reduction in earning capacity; disability; and, pain and suffering.

WHEREFORE, James Eischeid prays for judgment against Woods in a sum such

3

A-3

that will fully and fairly compensate him for injuries and damages sustained, along with interest as provided by law; the costs of this action; and, any other relief to which the Court deems him entitled.

## Count III

COMES NOW Plaintiff, James Eischeid, and in support of his cause of action against Otis. Koglin, Wilson Architects, Inc., f/k/a Otis Associates. Inc. (hereinafter "Otis"), states:

20. Paragraphs #1 through #15, inclusive of Count I, above are incorporated herein by reference.

21. At all times material hereto. Otis was an Illinois Corporation doing business in the State of Iowa.

22. At all times material hereto. Otis, by and through its employees. was responsible for the design of walls being constructed at the premises described above on or about March 17, 1999: and, in particular. was responsible for the design of the wall which failed causing Jim Eischeid's injuries.

23. On or before March 17, 1999, Otis was negligent in its design of said walls.

24. As a direct and proximate result of the negligence of Otis. James Eischeid sustained serious injuries, permanent in nature and has incurred and will in the future incur damages, including but not limited to: Doctor, hospital, and related medical expenses; lost wages; a reduction in earning capacity; disability; and, pain and suffering.

WHEREFORE, James Eischeid prays for judgment against Otis in a sum such that will fully and fairly compensate him for injuries and damages sustained. along with interest as provided by law; the costs of this action; and, any other relief to which the Court deems

4

A-4

him entitled.

## JURY DEMAND

**COMES NOW** the Plaintiff, James Eischeid, and demands a trial by jury of all issues herein.

WILLIA, STAHLE & ANDREASEN, L.L.P.

BY: _____

N. RICHARD WILLIA - WO 0006016
STEVEN J. ANDREASEN - WO 0013577
501 Pierce Street - #400
P.O. Box 1768
Sioux City IA 51102
(712) 277-0686
ATTORNEYS FOR PLAINTIFF

COPY TO:

John C. Gray
701 Pierce St. - #200
P O Box 3086
Sioux City IA 51102
ATTY: Dover Construction, Inc.

Daniel L. Hartnett
614 Pierce Street
P O Box 27
Sioux City IA 51102
ATTY: Woods Masonry, Inc.

PROOF OF SERVICE

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on _J - 14 - C / _.

BY:

| | | |
|---|---|---|
| ✗ U.S. Mail | ✗ FAX |
| ☐ Hand Delivered | ☐ Overnight Courier |
| ☐ Federal Express | ☐ Other: |

A - 5





FILED
U.S. DISTRICT COURT
NORTHERN DISTRICT OF
2003 JUN -2 AM 8:
SIOUX CITY DIV. OFFI
BY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

JAMES EISCHEID,

      Plaintiff,

vs.

DOVER CONSTRUCTION, INC., and
WOODS MASONRY, INC.,

      Defendants,

and

DOVER CONSTRUCTION, INC.,

      Third-Party Plaintiff,

vs.

WOODS MASONRY, INC.,

      Third-Party Defendant and
      Third-Party Plaintiff,

vs.

DeLOSS CONSTRUCTION, INC.,

      Third-Party Defendant.

No. C 00-4100-MWB

## MEMORANDUM OPINION AND ORDER REGARDING SUMMARY JUDGMENT MOTIONS INVOLVING CLAIMS BY AND AGAINST WOODS MASONRY

---

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  A. General Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  B. Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A-6

II. STANDARDS FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . 4

III. WOODS'S MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . 6
  A. Eischeid's "Direct" Claim Against Woods . . . . . . . . . . . . . . . . . . . . 6
  B. Dover's Third-Party Claims Against Woods . . . . . . . . . . . . . . . 8
    1. Pertinent factual context . . . . . . . . . . . . . . . . . . . . . . . . 8
    2. Arguments of the parties . . . . . . . . . . . . . . . . . . . . . 10
    3. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      a. Negligence and contribution claims . . . . . . . . . . . . 12
      b. Breach-of-contract claims . . . . . . . . . . . . . . . . 13
      c. Indemnity claims . . . . . . . . . . . . . . . . . . . . . . . 13
        i. Scope and interpretation of indemnity
           agreements . . . . . . . . . . . . . . . . . . . . . . 13
        ii. The indemnity provision at issue . . . . . . . . . 15
        iii. Is Dover's indemnity claim "unenforceable"? . . 15
        iv. Procedure to determine extent of indemnity . . . 19

IV. DELOSS'S MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . 20
  A. Pertinent Factual Background . . . . . . . . . . . . . . . . . . . . . . . . 21
  B. Arguments Of The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . 22
  C. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## I. INTRODUCTION

### A. General Factual Background

In this lawsuit, plaintiff James Eischeid asserts claims arising from an accident at a construction site on March 17, 1999. Eischeid was working at the site as an employee of Woods Masonry, Inc. (Woods), which was, in turn, a subcontractor for masonry work on the construction project for the general contractor, Dover Construction, Inc. (Dover),

A-7

Apparently because the construction project was behind schedule, Dover had also hired DeLoss Construction, Inc., to grout masonry walls as Woods completed the block work. Eischeid was seriously injured when an unbraced, ungrouted wall under construction on the project collapsed, apparently under the force of gusty winds.

## B. Procedural Background

Eischeid filed this lawsuit on September 15, 2000, asserting claims of negligence and failure to maintain a safe workplace against Dover. Dover filed a third-party complaint against Woods on November 3, 2000, then an amended third-party complaint on December 20, 2000, asserting that Woods's negligence caused Eischeid's injuries; that Woods breached the subcontract, by failing to obtain workers' compensation insurance, failing to comply with the plans and specifications, and failing to comply with OSHA safety regulations; and that Woods was required by the subcontract to indemnify Dover for any recovery Eischeid might receive against Dover. Eischeid eventually amended his complaint on March 19, 2001, to assert his own "direct" negligence claim against Woods, as well as a negligent design claim against the architects for the construction project, Otis, Koglin, Wilson Architects, Inc. On January 22, 2003, Eischeid dismissed his claims against the architects, leaving Dover and Woods as the only "direct" defendants. On August 7, 2002, Woods filed its own third-party complaint against DeLoss Construction, Inc., in which Woods alleges that DeLoss's negligence caused all or part of Eischeid's damages.

This matter is now before the court on two motions for summary judgment. First, on March 25, 2003, Woods moved for summary judgment on Eischeid's "direct" negligence claim against Woods and on Dover's third-party claims of negligence, breach of contract, and indemnity against Woods asserting, in essence, that the "exclusive

remedy" provisions of the Iowa Workers' Compensation Act, IOWA CODE CH. 668, bar both Eischeid's and Dover's claims. Dover resisted Woods's motion for summary judgment on April 11, 2003, but Eischeid has never responded to the motion. The second motion for summary judgment now before the court is third-party defendant DeLoss's April 25, 2003, motion, in which DeLoss contends that Woods has conceded that DeLoss did nothing wrong and is not at fault for the injuries to Eischeid. Woods resisted DeLoss's motion for summary judgment on May 15, 2003. These matters are now fully submitted and the court will consider them in turn. However, the court must first consider the standards applicable to these summary judgment motions.

## II. STANDARDS FOR SUMMARY JUDGMENT

As this court has explained on a number of occasions, applying the standards of Rule 56 of the Federal Rules of Civil Procedure providing for summary judgment, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377 (same). Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff*

R. Civ. P. 56(e) (the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *Celotex*, 477 U.S. at 324, suggesting that DeLoss's conduct in refusing to grout the remainder of the wall under construction on March 16, 1999, was a proximate cause of the wall collapsing on March 17, 1999. DeLoss is not entitled to summary judgment simply on the strength of Mr. Woods's purported admissions that DeLoss did nothing wrong, and DeLoss's motion for summary judgment will, therefore, be denied.

## V. CONCLUSION

Upon the foregoing,

1.     That portion of defendant Woods's March 25, 2003, motion for summary judgment (docket no. 83) pertaining to the "direct" negligence claim by plaintiff Eischeid against defendant Woods is **granted**. Eischeid's "direct" negligence claim against Woods is dismissed.

2.     That portion of third-party defendant Woods's March 25, 2003, motion for summary judgment (docket no. 83) pertaining to third-party claims by defendant and third-party plaintiff Dover against Woods is **granted in part and denied in part**, as follows:

a.     That portion of Woods's motion seeking summary judgment on Dover's claims of negligence and for contribution is **granted**. Those claims in Dover's third-party complaint are dismissed.

b.     That portion of Woods's motion seeking summary judgment on Dover's claim of breach of contract pertaining to breach of a contractual duty to procure workers' compensation insurance is also **granted**, and that portion of the

A - 10

breach-of-contract claim is also dismissed on the ground that Dover has withdrawn the claim. However, those portions of Dover's breach-of-contract claim pertaining to breaches of contractual duties to comply with the plans and specifications for the construction project and to comply with OSHA regulations are not properly in dispute on Woods's motion for summary judgment, or if they are, Woods's motion for summary judgment as to those portions of the breach-of-contract claim is **denied**, on the ground that those claims are subject to genuine issues of material fact.

     c.    That portion of Woods's motion seeking summary judgment on Dover's claim for indemnity is also **granted in part and denied in part**, as follows:

         i.    Woods's motion is **granted** as to any claim by Dover for indemnity for *Dover's* negligence, but

         ii.    Woods's motion is **denied** as to any claim by Dover for indemnity for *Woods's* negligence.

3.    Third-party defendant DeLoss's April 25, 2003, motion for summary judgment on Woods's third-party complaint (docket no. 91) is **denied in its entirety**.

    **IT IS SO ORDERED.**

    **DATED** this 2nd day of June, 2003.

Copies mailed on 6-2-03
to counsel of record or pro se parties
as shown on the docket sheet.

Deputy Clerk

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

# ...TURAL NOTES

## CODIFICATIONS:

...brative Code
... Construction (AISC)
... (ACI) (318-95)
... (AWS)

...missions, Permits.

... 30 psf
...plus snow load drifting
(where applicable)

... 25 psf

... of 80 MPH, Exposure C

## ...C PRESSURE:

...ortion has been carried out on
...uses by SCI Engineering &
...ervice Heights. Bores and the results
...investigation are contained in
...-2003 ...... 31, 1998, a
...ore...... ...ntract's

...in accordance
...ess of ... ...esting Laboratory.

## ...ILL:

...motions indicated on the drawings,
... y to obtain adequate soil bearing

...is narrowed so as to not undermine

...epared to properly reach the required

...ill, organic material which will, in the
...the builder, too.
...long split and water bearing
...norning grannous exceed and
...of the architect.

...ce areas shall be placed in layers
...y compacted to 85% maximum
...with ASTM D1557-78, until
...d.

...are to retain soil on one side
...in strength and shall be braced
...structure at four top and
...scaffolding operations begin.
...backfilled only after having
...web. or snake being temporarily
...any of its load support.
...acting as required if the nature of
...al sloe for greatest sloping to the

...5 days (4 1/2 bag min. cement
...was not noted otherwise.
...6 days (5 1/2 bag min. cement
...a grade.
...designed, mixed and placed in
...I recommendations and
...standards.

...ide the Architect, is sufficient
...review, copies of the mix design
...led with its use without

...admixtures containing same shall
...e any concrete.
...ontains plasticizing admixture and all
...e 3 weeks—there shall be air

...shall not pour concrete in adverse
...or when each is forecast for the
...ing the pour, unless proper
...on is provided continuously
...most its design strength.
...leaned shall be PVC ribbed type, 6"
...e ...ndtions,

## REINFORCING AND WELDED WIRE FABRIC:

ASTM A615—67, Grade 60; place in ACI clearances
unless detailed otherwise.
ASTM A185; for all welded wire fabric (WWF).
All reinforcing shall be placed to clearances per the
ACI and, in accordance with the recommendations
of the ACI and the Concrete Reinforcing Steel
Institute (CRSI).
Detail all W.W.F. in accordance with the latest edition
of the Welded Wire Fabric Manual of Standard
Practice (WRI Manual WF-105).
Provide bar supports and other accessories in
accordance with CRSI recommendations and
standard practices and, as necessary, to hold
reinforcing in proper position during concreting.
All W.W.F. shall be supported in position prior to
concrete placement.
Minimum bar laps shall be 36 bar diameters unless
detailed otherwise.
Reinforcing shall be cleaned of all oil, scale, rust, etc.,
which may impair bond.
Place "L" bars at all corners and wall intersections.
Size and spacing shall match those of the
horizontal reinforcing detailed.
Place 2 #5 additional bars at around each openings.
Extend 2'-0" beyond opening edge.
Reinforcing shop drawings shall show clearances to all
bars.

## SLAB AND WALL CONSTRUCTION JOINTS:

Floor slabs shall be placed with joints spaced at 20'-0"
maximum if not shown otherwise. Locate joints at column
center lines, and equally spaced between.
Construction joints shall be keyed at midwidth.
Hold all W.W.F. 1" clear of all construction joints.

## STRUCTURAL STEEL:

ASTM A36; all steel for this project, except as noted.
ASTM A325; 3/4"Ø (minimum) bolts for all connections.
ASTM A36; anchor bolts, embedded 12" plus 4"
hook, unless detailed otherwise.
ASTM A500 Grade B; for all Structural Tubing (TS) Fy
= 46 ksi
ASTM A501 or ASTM A53, Type E or S, Grade B; for
all structural pipe, Fy=36 ksi.
ASTM E70; all welding shall be by welders qualified
within the past 12 months, to weld in the required
positions, in accordance with AWS Standards and
recommendations.
All steel shall be fabricated, detailed and erected in
accordance with AISC Specifications latest
edition, and with the AISC Code of Standard
Practice.
Field cutting of structural steel shall not be permitted.
Fabricator shall select beam connections capable of
carrying either the reaction force when indicated or
one-half of the total uniform load for the given
size, span, and grade of the beam, as tabulated in
the AISC tables for allowable loads.
All connections to tube columns shall be thru-plates
unless otherwise noted.
All columns shall be set upon non-shrink grout with
minimum strength of 9000 per @ 28 days, using
setting plates. 1/4" thick and same size as base
plate.
Contractor shall verify locations and conditions of all
anchor bolts set for his use. He shall immediately
notify the Architect of any dimensional
discrepancies or existence of conditions of the
bolts which will not allow him to properly erect the
steel.
All beams shall bear a minimum of 6" on
100% solid masonry, at least 16" beams and 16"
either side of member centerline, unless detailed
and/or noted otherwise.
All Steel beams shall be anchored into masonry with L3
x 3" x 1/4" each side of web, typical unless detailed
otherwise.
All lintels composed of 2 or more shapes shall be welded
toe one unit prior to installation.
Verify lengths and elevations of all lintels with the
Architectural and Mechanical Drawings.
Provide lintels for all openings whether or not shown on
the Structural Drawings. Advise Architect of those
openings to show for review at Latel member sizes.
All steel sections which are lintels within masonry walls
shall have masonry clamped steel welded to the
appropriate flanges and webs, for attachment, by the
mason, of interior anchors, to be held up with the
masonry, as detailed for spacing on the Architectural
and Structural Drawings.
Structural Steel fabricator shall provide all required steel
for any roof openings whether shown or not on the
the Structural Drawings. Coordinate all requirements
with the pertinent trades.
Coordinate all requirements with the pertinent trades.
All steel shall have one coat of light gray rust inhibitive
primer paint.

## STEEL JOISTS:

Steel joists for this project are K Series, in
accordance with the Steel Joist Institute (SJI) Standards
for design, manufacture and erection.
Certification of compliance with SJI Standards shall be
noted on the Shop Drawings.
Provide lateral ceiling extensions for all joists in areas
where ceilings are noted.
Anchor joists to steel supports in accordance with SJI
and as detailed.

## METAL ROOF DECK:

Deck to be 1-1/2" deck with structural properties
corresponding to deck type noted on the drawings.
Deck shall be designed, fabricated, and installed in
accordance with the requirements of the Steel
Deck Institute (SDI).
Deck shall provide 3 span minimum coverage.
Overwear to 1/2" perpendicular to the deck span, and
whether shown or not on the Architectural and/or
Structural Drawings, may be cut into the deck
without reinforcing after review with the
Architect/Engineer to assure continued integrity of
the deck.
Openings greater than 12" perpendicular to the deck
span, and whether shown or not on the
Architectural and/or Structural Drawings shall be
reinforced with additional framing members,
spanning between the metal deck support members.
Additional framing members shall be provided and
installed by the trade requiring the opening and
shall submit sizes and arrangement of the
additional members, to the Architect, for his
review before fabrication of members.
Coordinate location of openings not shown on the
drawings and submit for the Architect/Engineer's
review, before cutting of the deck.

## MASONRY:

All concrete masonry shall be manufactured and placed
in accordance with ACI 531.1 "Specifications For
Concrete Masonry Construction", and ACI 531
"Building Code Requirements For Concrete
Masonry Structures".
All masonry units which bypass steel members, shall
be anchored as detailed.
Grouted bond beams and lintel blocks shall be filled
100% solid with Portland Cement Masonry Grout,
conforming to ASTM C476. Filling with mortar is
not acceptable.
All bearings of lintels shall be filled 100% solid, at
least 8" below and 12" either side of bearing unless
detailed and/or noted otherwise.
Masonry shall be braced adequately to withstand a wind
load of 20 psf minimum during construction.
All concrete masonry shall have a minimum compressive
strength (f'm) of 1500 psi, determined by testing of
masonry prisms or a function of individual
masonry units, mortar and grout, in accordance
with ACI 531.
Mason contractor shall provide triangular anchors for
anchor rods welded to the structural steel.
All walls shall have mechanical metal bonding per
Architect's details and the Project Specifications.
Vertical reinforcing in masonry cores shall be held in
place with bar positioners. Grouting of cores where
required shall be by high lift method.

## COORDINATION:

All dimensions shown on the Structural Drawings shall
be checked against the Architectural, and other
drawings, by the General Contractor, and any
discrepancies are to be reported immediately to the
Architect.
Contractor shall coordinate all pitches and depressions
in the floor slabs, and openings in the foundation
walls, with the pertinent trades, and shall review
locations of such openings as they may relate to the
weakening of the Structure.
Sleeves for openings shall be provided by the relevant
trade.
Shop Drawings shall be submitted for review by the
Structural Engineer, of all structural items, before
Fabrication. Should it become evident that the
Shop Drawings are being submitted with the appearance
not having been properly checked by the detailer prior
to the submission, they will be returned by the
Engineer, to the Detailer, without review, and the
transmittal will be classified as a "non-transmittal."
The information contained on the Structural Drawings
is, in itself, incomplete and void unless used in
conjunction with all of the Contract Documents
and of Specifications, trade practices, or
applicable standards, codes, etc., incorporated
therein by reference.
Use of these documents as shop drawings, in whole or
in part, is prohibited, and will be cause for the
rejection of the entire submittal.

## OTIS ASSOCIATES, INC

ARCHITECTS · ENGINEERS · LAND PLANNING · CONSTRUCTION MANAGERS

160 BELMONT AVENUE   LOMBARDVIEW, ILLINOIS   60446
PHONE 847 / 678-9821
FAX 847 / 678-9766

| | | | | | |
|---|---|---|---|---|---|
| Initial | date | no. | revision description | | |
| | | | | | |
| | | | | | |
| BF | 10/3/98 | | ISSUED FOR PERMIT & BUILDER REVIEW | | |
| | | | | | |

A-12



DEPOSITION
EXHIBIT

Klausner
CAF 5-27-8

# Standard Form of Agreement Between Owner and Contractor *where the basis of payment is a* STIPULATED SUM

## AIA Document A101-1997
### 1997 Edition -Electronic Format

THIS DOCUMENT HAS IMPORTANT LEGAL CONSEQUENCES. CONSULTATION WITH AN ATTORNEY IS ENCOURAGED WITH RESPECT TO ITS COMPLETION OR MODIFICATION. AUTHENTICATION OF THIS ELECTRONICALLY DRAFTED AIA DOCUMENT MAY BE MADE BY USING AIA DOCUMENT D401

AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

This document has been approved and endorsed by The Associated General Contractors of America.

Copyright 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, © 1997 by The American Institute of Architects. Reproduction of the material herein or substantial quotation of its provisions without written permission of the AIA violates the copyright laws of the United States and will subject the violator to legal prosecution.

AGREEMENT made as of the <u>Eighth</u> day of <u>December</u> in the year of <u>Nineteen Hundred Ninety-eight</u>
*(In words, indicate day, month and year)*

BETWEEN the Owner:
*(Name, address and other information)*
<u>Pine Tree Spencer, L.L.C., 51 Sherwood Terrace, Suite C, Lake Bluff, Illinois, 60044</u>

and the Contractor
*(Name, address and other information)*
<u>Dover Construction, Inc., 51 Sherwood Terrace, Suite A, Lake Bluff, Illinois 60044</u>

The Project is:
*(Name and location)*
<u>Pine Tree Plaza, 11th Street, Spencer, Iowa</u>

The Architect is:
*(Name, address and other information)*
<u>Otis Associates, Inc., 185 Milwaukee Avenue, Suite 200, Lincolnshire, Illinois, 60069</u>

The Owner and Contractor agree as follows.

## ARTICLE 1 THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement; these form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than Modifications, appears in Article 8.

## ARTICLE 2 THE WORK OF THIS CONTRACT

The Contractor shall fully execute the Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others.

AIA DOCUMENT A101 -OWNER - CONTRACTOR AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

User Document: SPENCER,IA.DOC -- 12/7/1998. AIA License Number 110723, which expires on 10/31/1999 -- Page #1
Electronic Format A101-1997

*A · 13*

Insert  A: The work of this contract shall be basically described as: a free standing retail facility totalling approximately 42,506 s.f. which includes site work, excavation, concrete, masonry, structural steel, ballasted roof system, E.F.I.S., storefront, doors, frames, hardware, drywall, acoustical ceiling, painting, fire protection, plumbing, HVAC, and electrical. Complete buildout of Staples per plans.

Insert  B: Not included in this contract: architectural services or fees, permits, civil engineering or staking, layout/staking of building, testing services, impact or similar fees, winter conditions, removal of any underground obstructions or environmental conditions, dewatering, landscaping, signage, overtime, time stabilization, geotextile fabric, unsuitable material, utility charges or fees, contingencies, buildout cost for any additional tenants other than Staples, detention ponds, etc.

## ARTICLE 3 DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

3.1 The date of commencement of the Work shall be the date of this Agreement unless a different date is stated below or provision is made for the date to be fixed in a notice to proceed issued by the Owner.
*(Insert the date of commencement if it differs from the date of this Agreement or, if applicable, state that the date will be fixed in a notice to proceed.)*
Upon closing and receiving written notice to proceed.

If, prior to the commencement of the Work, the Owner requires time to file mortgages, mechanic's liens and other security interests, the Owner's time requirement shall be as follows:

3.2 The Contract Time shall be measured from the date of commencement.

3.3 The Contractor shall achieve Substantial Completion of the entire Work not later than    days from the date of commencement, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. Unless stated elsewhere in the Contract Documents, insert any requirements for earlier Substantial Completion of certain portions of the Work.)*
September 15, 1999 weather conditions permitting

, subject to adjustments of this Contract Time as provided in the Contract Documents.
*(Insert provisions, if any, for liquidated damages relating to failure to complete on time or for bonus payments for early completion of the Work.)*
Owner will pay contractor $333.33 per day for each day between 1) the day which is sixty (60) days after the date that the contractor completes their work on the Staples space and 2) December 31, 1999. This amount will be paid to the contractor at the end of each month during which these amounts are due.

## ARTICLE 4 CONTRACT SUM

4.1 The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum shall be Two Million Four Hundred Thousand and no/100 Dollars ($ 2,400,000.00 ), subject to additions and deductions as provided in the Contract Documents.

4.2 The Contract Sum is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
*(State the numbers or other identification of accepted alternates. If decisions on other alternates are to be made by the Owner subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when that amount expires)*
This is a lump sum contract based upon the contract drawings. Any additional work will be at subcontractors cost plus ten percent (10%) for general conditions and five percent (5%) for profit. Any credits will be based on contractors cost only. Majority of curb work for site and masonry demising block walls between Staples and retail stores has been eliminated. Drywall/metal studs will be used in its place.

4.3 Unit prices, if any, are as follows:
N/A

## ARTICLE 5 PAYMENTS
### 5.1 PROGRESS PAYMENTS
5.1.1    Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.

AIA DOCUMENT A101 -OWNER - CONTRACTOR AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS. 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

User Document: SPENCER,IA.DOC – 12/7/1998. AIA License Number 110723, which expires on 10/31/1999 – Page #2    Electronic Format A101-1997

A - 14

**5.1.2** The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

**5.1.3** Provided that an Application for Payment is received by the Architect not later than the lastday of a month, the Owner shall make payment to the Contractor not later than the **fifteenth** day of the **next** month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than **fifteen** days after the Architect receives the Application for Payment.

**5.1.4** Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate the entire Contract Sum among the various portions of the Work. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy as the Architect may require. This schedule, unless objected to by the Architect, shall be used as a basis for reviewing the Contractor's Applications for Payment.

**5.1.5** Applications for Payment shall indicate the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

**5.1.6** Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1 Take that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the schedule of values, less retainage of **ten** percent ( **10** %). Pending final determination of cost to the Owner of changes in the Work, amounts not in dispute shall be included as provided in Subparagraph 7.3.8 of AIA Document A201-1997;

.2 Add that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the completed construction (or, if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing), less retainage of **ten** percent ( **10** %);

.3 Subtract the aggregate of previous payments made by the Owner; and

.4 Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Paragraph 9.5 of AIA Document A201-1997.

**5.1.7** The progress payment amount determined in accordance with Subparagraph 5.1.6 shall be further modified under the following circumstances:

.1 Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Architect shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and
*(Subparagraph 9.8.5 of AIA Document A201-1997 requires release of applicable retainage upon Substantial Completion of Work with consent of surety, if any.)*

.2 Add, if final completion of the Work is thereafter materially delayed through no fault of the Contractor, any additional amounts payable in accordance with Subparagraph 9.10.3 of AIA Document A201-1997.

**5.1.8** Reduction or limitation of retainage, if any, shall be as follows:
*(If it is intended, prior to Substantial Completion of the entire Work, to reduce or limit the retainage resulting from the percentages inserted in Clauses 5.1.6.1 and 5.1.6.2 above, and this is not explained elsewhere in the Contract Documents, insert here provisions for such reduction or limitation.)*
Owner will withhold ten percent (10%) retainage of requested amount until at least fifty percent (50%) of the project is complete. After that, retainage may be reduced. There is no retainage on structural steel.

**5.1.9** Except with the Owner's prior approval, the Contractor shall not make advance payments to suppliers for materials or

AIA DOCUMENT A101 -OWNER - CONTRACTOR AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

User Document: SPENCER,IA.DOC – 12/7/1998. AIA License Number 110723, which expires on 10/31/1999 – Page #3          Electronic Format A101-1997

*A 15*

equipment which have not been delivered and stored at the site.

## 5.2 FINAL PAYMENT

5.2.1 Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when:

.1 the Contractor has fully performed the Contract except for the Contractor's responsibility to correct Work as provided in Subparagraph 12.2.2 of AIA Document A201-1997, and to satisfy other requirements, if any, which extend beyond final payment; and

.2 a final Certificate for Payment has been issued by the Architect.

5.2.2 The Owner's final payment to the Contractor shall be made no later than 30 days after the issuance of the Architect's final Certificate for Payment, or as follows:

## ARTICLE 6 TERMINATION OR SUSPENSION

6.1 The Contract may be terminated by the Owner or the Contractor as provided in Article 14 of AIA Document A201-1997.

6.2 The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201-1997.

## ARTICLE 7 MISCELLANEOUS PROVISIONS

7.1 Where reference is made in this Agreement to a provision of AIA Document A201-1997 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

7.2 Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

*(Usury laws and requirements under the Federal Truth in Lending Act, similar state and local consumer credit laws and other regulations at the Owner's and Contractor's principal places of business, the location of the Project and elsewhere may affect the validity of this provision. Legal advice should be obtained with respect to deletions or modifications, and also regarding requirements such as written disclosures or waivers.)*

7.3 The Owner's representative is:
*(Name, address and other information)*
Peter Borzak

7.4 The Contractor's representative is:
*(Name, address and other information)*
Kevin W. Klausner

7.5 Neither the Owner's nor the Contractor's representative shall be changed without ten days written notice to the other party.

7.6 Other provisions:
Builder's Risk Insurance to be the responsibility of the owner. Survey of Property to be the responsibility of the owner. Permits, testing, impact fees, utility charges/fees, architectural/civil services and fees are the owners responsibility of the owner.

## ARTICLE 8 ENUMERATION OF CONTRACT DOCUMENTS

8.1 The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated as follows:

8.1.1 The Agreement is this executed 1997 edition of the Standard Form of Agreement Between Owner and Contractor, AIA Document A101-1997.

AIA DOCUMENT A101 -OWNER - CONTRACTOR AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

**8.1.2** The General Conditions are the 1997 edition of the General Conditions of the Contract for Construction, AIA Document A201-1997.

**8.1.3** The Supplementary and other Conditions of the Contract are those contained in the Project Manual dated , and are as follows:

| Document | Title | Pages |
|---|---|---|
| None | | |

**8.1.4** The Specifications are those contained in the Project Manual dated as in Subparagraph 8.1.3, and are as follows:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*

| Section | Title | Pages |
|---|---|---|
| None | | |

**8.1.5** The Drawings are as follows, and are dated unless a different date is shown below:
*(Either list the Drawings here or refer to an exhibit attached to this Agreement.)*

| Number | Title | Date |
|---|---|---|
| A001 | Cover Sheet | 10/09/98 |
| A002 | Specifications and Notes | 10/09/98 |
| S101A | Foundation Plan | 10/09/98 |
| S101B | Foundation Plan | 10/09/98 |
| S102A | Roof Framing Plan | 10/09/98 |
| S102B | Roof Framing Plan | 10/09/98 |
| S103 | Structural Details | 10/09/98 |
| A101A | Floor Plan | 10/09/98 |
| A101B | Floor Plan | 10/09/98 |
| A201 | Building Elevations | 10/09/98 |
| A202 | Building Elevations | 10/09/98 |
| A301 | Door Schedule/Jamb Details/Partition Types | 10/09/98 |
| A401 | Wall Sections & Details | 10/09/98 |
| A402 | Wall Sections & Details | 10/09/98 |
| A501 | Details | 10/09/98 |
| A601A | Reflected CeilingPlan | 10/09/98 |
| A601B | Reflected Ceiling Plan | 10/09/98 |
| STAPLES | | |
| C-1 | Cover Sheet | 11/13/98 |
| A-0 | General Notes | 11/13/98 |
| A-1 | Floor Plan | 11/13/98 |
| A-2 | Partial Enlarged Floor Plan | 11/13/98 |
| A-3 | Interior Elevations | 11/13/98 |
| A-4 | Details, Walls Sections & Types | 11/13/98 |
| A-5 | Door & Window Finish Schedule | 11/13/98 |
| E-1 | Power Plan | 11/13/98 |
| E-2 | Partial Enlarged Power Plan | 11/13/98 |
| E-4 | Lighting Plan | 11/13/98 |
| E-5 | Low Voltage Systems Floor Plan | 11/13/98 |
| E-6 | Electrical Details | 11/13/98 |
| E-7 | EMS Details and Schedule | 11/13/98 |
| M-1 | HVAC Floor Plan | 11/13/98 |
| M-2 | HVAC Schedule And Details | 11/13/98 |
| P-1 | Plumbing Floor Plan and Details | 11/13/98 |

**8.1.6** The Addenda, if any, are as follows:

| Number | Date | Pages |
|---|---|---|
| None | | |

AIA DOCUMENT A101 -OWNER - CONTRACTOR AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 8.

**8.1.7** Other documents, if any, forming part of the Contract Documents are as follows:

*(List here any additional documents that are intended to form part of the Contract Documents. AIA Document A201-1997 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*
**None**

This Agreement is entered into as of the day and year first written above and is executed in at least three original copies, of which one is to be delivered to the Contractor, one to the Architect for use in the administration of the Contract, and the remainder to the Owner.

OWNER *(Signature)*

Pine Tree Spencer. L.L.C.

Peter Borsale        Managing Member
*(Printed name and title)*

CONTRACTOR *(Signature)*

Dover Construction. Inc.

Kevin W. Klausner  (President)
*(Printed name and title)*

AIA DOCUMENT A101 -OWNER - CONTRACTOR AGREEMENT - 1997 EDITION - AIA - COPYRIGHT 1997 - THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE N.W., WASHINGTON, D.C. 20006-5292. WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution. This document was electronically produced with permission of the AIA and can be reproduced without violation until the date of expiration as noted below.

User Document: SPENCER,IA.DOC -- 12/7/1998. AIA License Number 110723, which expires on 10/31/1999 -- Page #6        Electronic Format A101-1997

A - 1 8



# DOVER
## CONSTRUCTION
### INC.

51 Sherwood Terrace, Suite A, Lake Bluff, Illinois 60044          (847) 735-6304          Fax 847-615-4272



#5

DEPOSITION
EXHIBIT
Woods # 3
CMF 12-3-02

## SUBCONTRACT AGREEMENT

**CONTRACT DATE:**     January 26, 1999

**PROJECT:**     PINE TREE PLAZA
11th Street Southwest
Spencer, IA.

**SUBCONTRACTOR:**  Woods Masonry Inc.

169 Piney Point Court
Pottsville, Arkansas 72858

**JOB NUMBER:**     99100

---

The Subcontractor agrees to immediately order and furnish all necessary, tools, and equipment and to schedule and perform all labor and
as described in the scope of work section below. Such work shall strictly adhere to Contractor's Construction Schedule and shall be

services required for : ___ Masonry Labor
completed on or before : ___ July 15, 1999

All work shall be in accordance with plans and specifications prepared by: ___ Otis Associates, Inc. ___ Dated: ___ October 16, 1998
and enumerated as follows :

JOB # 98048 Drawings # A001, A002, S101A, S101B, S102A, S102B, S103, A101A, A101B, A201, A202, A301, A302,
A401, A402, A501, A601A, A601B, C-1, A-1, A-2, A-3, A-4, A-5, E-1, E-2, E-3, E-4, E-5, E-6, E-7, M-1, M-2, P-1

STAPLES prototype Outline Specifications, Dated AUGUST 15, 1998, Pages #1 through # 59

~~Kruse, Cate & Nelson, P.C. Engineering Services Drawing No. 1537-01, 1537-02, 1537-03, 1537-04, 1537-05, DATED 11/04/98~~

---

**INVOICING PROCEDURE:**

1 Payment will not be made unless an Invoice, a signed Contract, Certificate of Insurance and a Final Waiver have been returned to this office. Indicate Job Number on all invoices. Ten percent (10%) retention withheld until final completion and acceptance of all work. Invoices and a Waiver of Lien due on Monday of each week for labor completed the previous Friday. The payment will be issued on the following Wednesday if this procedure and proper documents are submitted on time. All quantities for payment shall be contingent upon verification by a Dover Construction Inc. authorized representative.

2 Final bill us within 10 days of completion of job

3 No extras can be added to this Subcontract amount except by a signed Work Order that agrees with the original Subcontract terms (Invoice extras separately.)

4 Overtime is not permitted unless authorized by the Home Office Construction Department

5 ___ X ___ If checked, your Partial and/or Final Waivers are required. Submit with pay request.

6 ~~If checked, your Material Affidavits and Suppliers Waivers are required.~~

7 On Time and Material Contracts, Subcontractor is to provide Contractor with a Work Ticket on a daily basis stating each employee's name and hours worked and signed by Contractor's Onsite Superintendent.

**ADDITIONAL WORK:**

Additional work authorized by the Contractor, if accomplished on time and material basis, shall be invoiced at:

$ 30.00 per hour     mason
$ 20.00 per hour     laborer

Materials shall be invoiced at cost plus:     15%     profit

For additional work, the Subcontractor must render separate invoices to the Contractor, as specified above.

**CONTRACT AMOUNT:**     One Hundred Thousand Four Hundred and Sixty and 00/100 Dollars     $     100,460.00

**EQUIPMENT SCHEDULE NOTIFICATION DATE:**     02/03/99

**SCOPE OF WORK:**  Furnish labor and equipment for complete scope per plans and specs including but not limited to the following:

vide masonry labor to set 23,740 block at a cost of $4.00 per block

vide masonry labor and equipment for complete installation of block including labor for setting block, mortar, reinforcing wire, vertical reinforcing steel, masonry door frames and misc. steel imbeds.

Provide labor only for grouting of wall at a cost of $2,500.00 premixed grout provided by others

Provide Equipment mobilization to and from the construction site. The agreed sum of mobilization will be a one time cost of $3,000.00.

Perform all work according to OSHA regulations and conduct weekly "Tool Box" safety meetings, Supply Material Safety Data Sheets

Provide Layout and supervision for contracted work.

Provide clean up labor of all debris related to this contract. All debris shall be placed in general contractor supplied containers Equipment and supplies may be stored on site only under our supervisors permission and direction.

Mobilization and start up to begin on or before February 8th 1999. The masonry labor duration will not exceed 25 working days.

The cost of winterizing this project will be determined on a time and material basis

Subcontractor hereby accepts this contract on the terms and conditions on the face and reverse side hereof.

**DOVER CONSTRUCTION INC.**                    **Woods Masonry Inc.**

_signature_                                      _signature_

President                                        President

Accepted (Name & Title/Position)

DATE     2/5/99                    DATE     2-3-99

A     19

**1 DOCUMENTS**
The documents referenced on the reverse are made a part of this Contract. The Subcontractor represents that he has had an opportunity to examine drawings for the work to be performed hereunder, and has examined the job site, its surrounding and local conditions; that he has made all investigations essential to a full understanding of all circumstances and the difficulties which may be encountered, and that Subcontractor has specific qualifications for doing the Work in accordance with such drawings and the terms of this Contract by the use specified herein.

**2 SCHEDULE:**
Time is the essence of this Contract. It is understood that the Subcontractor agrees to start the work immediately. This Subcontractor shall complete his work without delay as expeditiously as possible and in accordance with the Contractor's construction schedule, or as noted on the reverse.
Subcontractor will furnish Contractor with a complete schedule of equipment delivery dates in writing by the date specified on the face of this contract. Failure to notify Contractor of any delays in equipment by the date specified will result in this subcontractor assuming all fees incurred to expedite equipment in order to assure our completion date.
Subcontractor shall furnish two (2) complete project manuals with all warranties and operations, equipment cuts, as-built drawings, etc. within seven (7) days of project completion.

**3 INSOLVENCY:**
The Subcontractor agrees that if it should file for bankruptcy, or if it makes a general assignment for the benefit of creditors, or if a receiver is appointed on account of its insolvency, or if it neglects to prosecute the Work diligently and properly or fails to perform any provision of this Contract including prompt payment of wages, union benefits or any other obligations, or if it disregards laws, ordinances, rules, regulations or orders of any public authority, the Contractor, upon written notice to the Subcontractor may without prejudice to any other right or remedy it may have, terminate the employment of the Subcontractor and take possession of the site and of all materials, equipment tools and equipment thereon and may finish the Work by whatever method it may deem expedient and may deduct the cost thereof from the payments then or thereafter due the Subcontractor.

**4 ASSIGNMENT OF CONTRACT:**
No assignment of this Contract or monies due, or which may become due hereunder, shall be made without the prior written consent of the Contractor.

**5 PERMITS AND INSPECTION FEES:**
All permits, licenses and inspection fees (other than the general local building permit, as distinguished from such permits or licenses as may be required with respect to specific Work to be performed under this Contract) are to be paid by the Subcontractor.

**6 WORKING CONDITIONS:**
Subcontractor shall at all times provide adequate competent personnel, shall cooperate with Contractor and shall work harmoniously with all other Subcontractors performing work at the site. Subcontractor shall perform its work in such a manner so as to prevent other Subcontractors to accomplish and work within the limits of Contractor's schedule. Subcontractor agrees to comply with the Department of Labor Occupational Safety and Health Standard Act of 1970, Title 29, Chapter XVII, Part 1910 effective April 27, 1971, as amended by any subsequent federal regulations, as applicable to the scope of the Contract as specified and intended under this Contract Agreement, and further agrees to comply with all laws, ordinances, statutes, and/or local, state or lateral administrative rulings of every kind as may apply to the Work and/or Subcontractor's activities of any kind at the job site. In the event of non-compliance and/or violation of said rules and regulations, and resulting fines, penalties and/or work cessation orders, issued to the Subcontractor and/or Contractor hereunder
Subcontractor agrees to immediately correct any and all violations entirely at its own expense and further to immediately pay such fines or penalties issued to Subcontractor and/or Contractor and reimburse Contractor for any and all costs, damages and expenses resulting therefrom.
Subcontractor agrees to accept a "back charge" deduction from its invoices for Contractor's supervisor's time and travel costs if more than one trip to the job is required of Contractor because of Subcontractor's failure to complete a punch list items specified by Contractor.

**7 INSURANCE AND INDEMNIFICATION:**
Prior to starting work, the Subcontractor shall obtain the required insurance as hereinafter set forth or such insurance referred by the mortgagee of the Property owner, and shall furnish satisfactory evidence to the Contractor that the Subcontractor has complied with said requirements.

This Subcontractor hereby agrees that it will obtain insurance as follows:

Comprehensive general liability, including blanket contractual liability:

| | |
|---|---|
| $ 1,000,000.00 per person, bodily injury liability | |
| $ 1,000,000 per occurrence, bodily injury and death | |
| $ 500,000 each occurrence, property damage liability | |
| $ 500,000 aggregate property damage liability | |

Automobile public liability (owned, leased and non-owned vehicles):

$ 1,000,000 per person, bodily injury liability
$ 1,000,000 per occurrence, bodily injury and death
$ 500,000 each occurrence, property damage liability
$ 500,000 aggregate property damage liability

Such insurance must be written by a company or companies acceptable to Contractor.
The Subcontractor further agrees that it will obtain insurance to cover all workmen as follows:
Workmen's Compensation and Occupational Diseases with statutory limits as provided by the State of Illinois, or any other State in which the work hereunder is to be performed, and Employer's liability with a limit of not less than $300,000 for all damage from one or more claims.
It is agreed that certificates for the aforesaid insurance will be submitted to Contractor before the actual commencement of any work. Such certificates must indicate that the hold harmless agreement as hereinafter set forth is insured and furthermore must provide that 15 days advance written notice will be given to the party to whom such certificates are issued in the event of cancellation of the policies or a reduction in the limits thereof. Under no circumstances will any invoices for progress payments or final payment be honored by Contractor unless such certificates of insurance have been filed with Contractor. Failure of Subcontractor to provide aforementioned certificates of insurance in no manner voids Subcontractor obligations as set forth herein.
Subcontractor shall obtain all-risk Builders Risk Insurance in an amount equal to the amount of this Contract, subject to a deductible not to exceed $100.00. Said insurance shall name the Contractor and Subcontractor as insureds, and shall be kept in full force and effect throughout the term of this Contract. Subcontractor shall submit a copy of the policy or other evidence satisfactory to Contractor as proof of said insurance.

**8 JOINT USE:**
Joint use of facilities may be permitted by the Subcontractor only with prior written approval of the Contractor and then such joint use shall be the total responsibility of the Subcontractor including any damage to person or property and Subcontractor shall require such joint user to furnish a hold harmless agreement to Subcontractor and Contractor, and to provide all insurance required herein.

**9 RUBBISH REMOVAL:**
Subcontractor shall keep his rubbish and waste material from accumulating and shall remove same from the job site periodically, as necessary to keep the job site in a clean, safe and hazard free condition at all times throughout the term of this agreement. The Contractor shall have the right to demand removal as necessary to keep the premises clean. If the rubbish is not removed within twenty-four (24) hours after notice, removal may be performed at Contractor's option, by Contractor. Back charges to the Subcontractor will be made for all costs incurred plus 15% overhead, and the Subcontractor hereby authorizes such back charges to be deducted from any invoices rendered to Contractor.

**10 TAXES AND BENEFITS:**
The Subcontractor agrees to pay all sales tax, income tax, personal property tax, union benefits, social security, old age benefits, and unemployment compensation taxes, and other taxes related thereto for all labor, material and equipment used by the Subcontractor during the work.

**11 DISPUTES:**
In the event of a dispute or disagreement of any kind between Contractor and Subcontractor, the judgment and decision of owners Architect shall be controlling and conclusive, and Subcontractor does hereby release and forever discharge Contractor, its officers, employees, agents, successors and assigns of and from any and all manner of action or causes of actions, in law or equity, or liens, allegedly arising out of or in connection with the Work.

**12 HOLD HARMLESS AGREEMENT:**
The Subcontractor will and does agree to defend, indemnify, save and hold harmless, Contractor, the Owners, the architects, their agents, employees and assigns, to the fullest extent permitted by law, of and from all claims, loss, damage, injury causes and actions, suits of whatsoever nature (except only any thereof resulting from the negligent act or omission of any or all of the Indemnitees), for personal injury, including death resulting therefrom, and for property damage legally or to arise out of, or any conditions, of the work performed under this Contract, whether by this Subcontractor or by any sub-Subcontractor of this Subcontractor, and whether any such claim, cause of action, or suit is asserted against Contractor, the owners, and/or the architects, their agents, employees and assigns of this Subcontractor will and hereby agrees to indemnify and hold harmless, Contractor, the owners, the architects, their agents, employees, and assigns of and from all costs of investigation, adjustment, attorney's fees, court costs, administrative costs, and other related items or expense arising out of any claim, cause of action or suit of the kind and nature set forth in the preceding paragraph.

Subcontractor specifically declares and admits that the indemnity and hold harmless agreements contained in the two (2) preceding paragraphs apply with equal force, validity, and intent to the liabilities of Contractor, the owners, the architects, their agents and employees, and assigns, existing by virtue of the provisions of the "Act providing for the protection and safety of persons in or about the construction, repairing, alteration, or removal of buildings, bridges, via-ducts, and other structures, and to provide for the enforcement thereof, "Section 80 of Ill. Rev. Stats, Section 60 et seq. being known as Structural Work as amended, and under such comparable statutes of the State in which the work hereunder is to be performed
The obligations of the Subcontractor hereunder shall not extend to the liability of the architect or engineer, his agents or employees arising out of (1) the preparation or approval of maps, drawings, opinions, reports, surveys, change orders, designs, or specifications, or (2) the giving of or the failure to give directions or instructions by the architect or engineer, his agents or employees provided such giving or failure to give is the primary cause of the injury or damage.

**13 GUARANTEES:**
Subcontractor guarantees to repair or replace any or all of its work which may in the opinion of the Contractor, be defective in workmanship or material within a period of 365 days from date of completion of the work, together with any damage resulting from such defect and any other adjacent work which may be displaced by such repair or replacement, without any expense whatsoever to the Contractor. In the event of its failure to comply with the aforesaid guarantee within ten (10) days after being notified in writing by the Contractor, Subcontractor does hereby authorize the Contractor to proceed to have said noncompliance remedied or said defect repaired and made good at Subcontractor's expense, and Subcontractor will honor and pay the costs and charges therefore upon demand.

**14 THE CONTRACT SUM:**
Upon satisfactory completion of all the Work and in accordance with the terms and schedule noted on the reverse, the Contractor shall pay the Subcontractor in current funds for the performance of the Work, subject to additions and deductions authorized by written Change Order signed by Contractor, the total price noted on the reverse which is inclusive of applicable taxes, licenses, permits, delivery charges, loading and unloading costs, labor, material, profit and overhead, and Subcontractor's daily clean-up expenses.

**15 CHANGES AND EXTRAS:**
The Contractor, without invalidating this Contract, may make changes by adding to or deducting from the Work, and the Contract price shall be adjusted accordingly, as hereinafter provided. All such work shall be executed under conditions of the original Contract. The only Contractor representative authorized to make changes or extras to the work is the President who has signed this original document. Any other authorizations are invalid and will not be honored.
Invoices for additional work will not be honored by Contractor unless such additional work has been authorized in writing by the Contractor. This means, if required and a material list shall be signed daily by Contractor's superintendent and the same shall be attached to the invoice, and if not attached in proper and complete form, the invoice shall not be honored for payment.
Overtime work, if authorized in writing by the Contractor, and performed on the basis of premium wages, shall be invoiced to the Contractor at Subcontractor's cost, exclusive of profit.

**16 PROGRESS AND FINAL PAYMENTS:**
Progress payments will not be made until (1) an executed copy of this Contract has been returned by Subcontractor to Contractor, (2) Certificates of Insurance evidencing coverage required herein have been filed with the Contractor's office and accepted by the Contractor, and (3) waivers of lien and evidence of payment to material men have been submitted to and accepted by Contractor. Applications for progress payments shall be in writing, shall be submitted in accordance with the invoicing procedures, and shall conform to the payment schedule on the reverse side.
Final payment shall be due when the Work is fully completed and performed in accordance with the Contract Documents and is satisfactory to the Architect and Contractor. Subcontractor must submit to the Contractor satisfactory guarantees, warranties and certificates required by the specifications and terms of this agreement before final payment will be issued. Before issuance of the final payment, the Subcontractor, if required, shall submit evidence satisfactory to the Contractor that all payrolls, bills for materials and equipment, and all known indebtedness connected with the Subcontractor's Work has been paid, and shall submit to Contractor final waivers of lien satisfactory to Contractor.
Contractor has the right to issue checks jointly to the Subcontractor and any party to whom the Subcontractor is indebted to in connection with this contract.

**GENERAL:**
The Contractor and the Subcontractor for themselves, their successors, executors, administrators and assigns do hereby agree to the full performance of the covenants of this agreement.

A 20



# DOVER
## CONSTRUCTION
### INC.



B. DeLoss
EXHIBIT
# 4

51 Sherwood Terrace, Suite A, Lake Bluff, Illinois 60044    (847) 735-6304    Fax 847-615-8272

## SUBCONTRACT AGREEMENT

**CONTRACT DATE:** March 26, 1999

**PROJECT:** PINE TREE PLAZA

11th Street Southwest

**SUBCONTRACTOR:** DeLoss Construction Incorporated
P.O.Box 1375
Spencer IA. 51301-1375

Spencer, IA.

**JOB NUMBER:** 99100

---

The Subcontractor agrees to immediately order and furnish all necessary material, tools, and equipment and to schedule and perform all labor and services required for: **EXCAVATION AND CONCRETE**

as described in the scope of work section below. Such work shall strictly adhere to Contractor's Construction Schedule and shall be completed on or before: **July 15, 1999**

All work shall be in accordance with plans and specifications prepared by: **Otis Associates, Inc.** Dated **October 16, 1998** and enumerated as follows:

JOB # 98048 Drawings # A001, A002, S101A, S101B, S102A, S102B, S103, A101A, A101B, A201, A202, A301, A302, A401, A402, A501, A601A, A601B, C-1, A-1, A-2, A-3, A-4, A-5, E-1, E-2, E-3, E-4, E-5, E-6, E-7, M-1, M-2, P-1

STAPLES prototype Outline Specifications, Dated AUGUST 15, 1998, Pages #1 through # 59

Kruse, Cate & Nelson, P.C. Engineering Services, Drawing No. 1537-01, 1537-02, 1537-03, 1537-04, 1537-05, DATED 11/04/98

---

**INVOICING PROCEDURE:**

1. Payment will not be made unless an invoice, a signed Contract, Certificate of Insurance and a Final Waiver have been returned to this office. Indicate Job Number on all invoices. Ten icent (10%) retention withheld until final completion and acceptance of all work. Invoices due the 25th of each month projecting to the amount of work to be completed by the end of the month.

2. Final bill us within 10 days of completion of job.

3. No extras can be added to this Subcontract amount except by a signed Work Order that agrees with the original Subcontract terms. (Invoice extras separately.)

4. Overtime is not permitted unless authorized by the Home Office Construction Department.

5. __x__ If checked, your Partial and/or Final Waivers are required. Submit with pay request.

6. __x__ If checked, your Material Affidavits and Supplier's Waivers are required.

7. On Time and Material Contracts, Subcontractor is to provide Contractor with a Work Ticket on a daily basis stating each employee's name and hours worked and signed by Contractor's Onsite Superintendent.

**ADDITIONAL WORK:**

Additional work authorized by the Contractor, if accomplished on time and material basis, shall be invoiced at:

Materials shall be invoiced at cost plus: **10%** profit

For additional work, the Subcontractor must render separate invoices to the Contractor, as specified above.

**CONTRACT AMOUNT:** ONE HUNDRERD EIGHTY-FOUR THOUSAND THREE HUNDRED AND SEVENTY-EIGHT AND 00/100 DOLLARS  $  **-184,378.00**

**EQUIPMENT SCHEDULE NOTIFICATION DATE:** NONE

**SCOPE OF WORK:** Furnish materials, labor and equipment for complete CONCRETE scope per plans and specs including but not limited to the following:

1. Perform all work according to OSHA regulations and conduct weekly "Tool Box" safety meetings, Supply Material Safety Data Sheets
2. Supply required shop drawings, submittals and samples. Provide Layout and supervision for contracted work.
3. Pay all related taxes, insurance, licences, fees, and delivery charges
4. Provide clean up and disposal off site of all concrete work related debris, All equipment and supplies may be stored on site only under our supervisors permission and direction
5. Provide labor and materials for complete scope of foundation excavation and backfill per plans and specs
6. Provide and place granular fill under interior and exterior concrete slabs per plans and specs
7. Provide concrete trench footings and walls per plan alternate on sheet S103 minimum 24" wide.
8. Provide labor and materials for; column piers and footings.
9. Provide steel reinforcing for all concrete structures per plans and specs
10. Provide labor, concrete, misc. materials and saw cutting for building slabs interior and exterior per plans and specs
11. Provide concrete, labor and materials for loading dock per plans and specs
12. All concrete testing by others.
13. Provide labor and materials for placement of dock trench drain
14. Concrete bollards supplied and installed by others
15. Provide and install foundation insulation, expansion joint filler, and expansion materials
16. Provide concrete materials for winter conditions, provide ground freeze protection of mulch or blankets, provide interior piers w/ frost protection.
17. Provide labor ONLY for setting plates, angle steel imbeds and anchor bolts. Anchor bolts, setting plates, and steel angle imbeds supplied by others.

Subcontractor hereby accepts this contract on the terms and conditions on the face and reverse side hereof.

**DOVER CONSTRUCTION INC.**

_____
President

**DeLoss Construction Incorporated**

_____
Accepted (Name & Title/Position)

DATE  04/07/99

DATE  4/7/99

GENERAL CONTRACTOR    SUBCONTRACTOR    A-2



**1 DOCUMENTS**

The documents referenced on the reverse are made a part of this Contract. The Subcontractor represents that he has had an opportunity to examine drawings for the work to be performed hereunder, and has examined the job site, its surrounding and local conditions; that he has made all investigations essential to a full understanding of all circumstances, and the difficulties which may be encountered, and that Subcontractor has specific qualifications for doing the Work in accordance with such drawings and the terms of this Contract by the date specified herein.

**2 SCHEDULE:**

Time is the essence of this Contract. It is understood that the Subcontractor agrees to start the work immediately. This Subcontractor shall complete his work without delay as expeditiously as possible and in accordance with the Contractor's construction schedule, or as noted on the reverse.

Subcontractor will furnish Contractor with a complete schedule of equipment delivery dates in writing by the date specified on the face of this contract. Failure to notify Contractor of any delays in equipment by the date specified will result in this subcontractor assuming all fees incurred to expedite equipment in order to assure our completion date.

Subcontractor shall furnish two (2) complete project manuals with all warranties and guarantees, equipment cuts, as-built drawings, etc. within seven (7) days of project completion.

**3 INSOLVENCY:**

The Subcontractor agrees that if it should file for bankruptcy, or if it makes a general assignment for the benefit of creditors, or if a receiver is appointed on account of its insolvency, or if it neglects to prosecute the Work diligently and properly or fails to perform any provision of this Contract including prompt payment of wages, union benefits or any other obligations, or if it disregards laws, ordinances, rules, regulations or orders of any public authority, the Contractor, upon written notice to the Subcontractor, may without prejudice to any other right or remedy it may have, terminate the employment of the Subcontractor and take possession of the site and of all materials, equipment tools and equipment thereon and may finish the Work by whatever method it may deem expedient and may deduct the cost thereof from the payments then or thereafter due the Subcontractor.

**4 ASSIGNMENT OF CONTRACT:**

No assignment of this Contract or monies due, or which may become due hereunder, shall be made without the prior written consent of the Contractor.

**5 PERMITS AND INSPECTION FEES:**

All permits, licenses and inspection fees (other than the general local building permit, as distinguished from such permits or licenses as may be required with respect to specific Work to be performed under this Contract) are to be paid by the Subcontractor.

**6 WORKING CONDITIONS:**

Subcontractor shall at all times provide adequate competent personnel, shall cooperate with Contractor and shall work harmoniously with all other Subcontractors performing work at the site. Subcontractor shall perform its work in such a manner so as to permit other Subcontractors to accomplish and work within the limits of Contractor's schedule. Subcontractor agrees to comply with the Department of Labor Occupational Safety and Health Standard Act of 1970, Title 29, Chapter XVII, Part 1910 effective April 27, 1971, as amended by any subsequent federal regulations, as applicable to the scope of this Contract as specified and intended under this Contract Agreement, and further agrees to comply with all laws, ordinances, statutes, and/or local, state or federal administrative rulings of every kind as may apply to the Work and/or Subcontractor's activities of any kind at the job site. In the event of non-compliance and/or violation of said rules and regulations, and resulting fines, penalties and/or work cessation orders, issued to the Subcontractor and/or Contractor hereunder.

Subcontractor agrees to immediately correct any and all violations entirely at its own expense and further to immediately pay such fines or penalties issued to Subcontractor and/or Contractor and reimburse Contractor for any and all costs, damages and expenses resulting therefrom.

Subcontractor agrees to accept a "back charge" deductible from its invoices for Contractor's supervisor's time and travel costs if more than one trip to the job is required of Contractor because of Subcontractor's failure to complete punch list items specified by Contractor.

**7 INSURANCE AND INDEMNIFICATION:**

Prior to starting work, the Subcontractor shall obtain the required insurance as hereinafter set forth or such insurance refused by the mortgage of the Property owner, and shall furnish satisfactory evidence to the Contractor that the Subcontractor has complied with said requirements.

This Subcontractor hereby agrees that it will obtain insurance as follows:

Comprehensive general liability, including blanket contractual liability.

| | |
|---|---|
| $ 1,000,000.00 per person, bodily injury liability | Automobile public liability (owned, leased and non-owned vehicles): |
| $ 1,000,000 per occurrence, bodily injury and death | $ 1,000,000 per person, bodily injury liability |
| $ 500,000 each occurrence, property damage liability | $ 1,000,000 per occurrence, bodily injury and death |
| $ 500,000 aggregate property damage liability | $ 500,000 each occurrence, property damage liability |
| | $ 500,000 aggregate property damage liability |

Such insurance must be written by a company or companies acceptable to Contractor

The Subcontractor further agrees that it will obtain insurance to cover its workmen as follows:

Workmen's Compensation and Occupational Disease with statutory limits as provided by the State of Illinois, or any other State in which the work hereunder is to be performed, and Employer's liability with a limit of not less than $300,000 for all damage from one or more claims

It is agreed that certificates for the aforesaid insurance will be submitted to Contractor before the actual commencement of any work. Such certificates must indicate that the hold harmless agreement as hereinafter set forth is insured and furthermore must provide that 15 days advance written notice will be given to the party to whom such certificates are issued in the event of cancellation of the policies or a reduction in the limits thereof. Under no circumstances will any progress or final payment be honored by Contractor unless such certificates of insurance have been filed with Contractor. Failure of Subcontractor to provide aforementioned certificates of insurance in no manner voids Subcontractors obligations as set forth herein.

~~Subcontractor shall obtain all-risk Builder's Risk insurance in an amount equal to the amount of the Contract, subject to a deductible not to exceed $100.00. Said insurance shall name the Contractor and Subcontractor as-insureds, and shall be kept in full force and effect throughout the term of this Contract. Subcontractor shall submit a copy of the policy or other evidence satisfactory to Contractor, as proof of said insurance.~~

**8 JOINT USE:**

Joint use of facilities may be permitted by the Subcontractor only with prior written approval of the Contractor and then such joint use shall be the total responsibility of the Subcontractor including any damage to person or property and Subcontractor shall require such joint user to furnish a hold harmless agreement to Subcontractor and Contractor, and to provide all insurance required herein.

**9 RUBBISH REMOVAL:**

Subcontractor shall keep his rubbish and waste material from accumulating and shall remove same from the job site periodically, as necessary to keep the job site in a clean, safe and hazard free condition at all times throughout the term of this agreement. The Contractor shall have the right to demand removal as necessary to keep the premises clean. If the rubbish is not removed within twenty-four (24) hours after notice, removal may be performed at Contractor's option, by Contractor. Back charges to the Subcontractor will be made for all costs incurred plus 15% overhead, and the Subcontractor hereby authorizes such back charges to be deducted from any invoices rendered to Contractor.

**10 TAXES AND BENEFITS:**

The Subcontractor agrees to pay all sales tax, income tax, personal property tax, union benefits, social security, old age benefits, and unemployment compensation taxes, and other taxes related thereto for all labor, material and equipment used by the Subcontractor during the Work.

**11 DISPUTES:**

In the event of a dispute or disagreement of any kind between Contractor and Subcontractor, the judgment and decision of owners Architect shall be controlling and conclusive, and Subcontractor does hereby release and forever discharge Contractor, its officers, employees, agents, successors and assigns of and from any and all manner of action or causes of actions, in law or equity, or liens, allegedly arising out of or in connection with the Work.

**12 HOLD HARMLESS AGREEMENT:**

The Subcontractor will and does agree to defend, indemnify, save and hold harmless, Contractor, the Owners, the architects, their agents, employees and assigns, to the fullest extent permitted by law, and from all claims, loss, damage, injury causes and actions, suits of whatsoever nature (except only any thereof resulting from the negligent act or omission of any or all of the indemnities), for personal injury, including death resulting therefrom, and for property damage alleged to arise out of, or any conditions, of the work performed under this Contract, whether by this Subcontractor or by any sub-Subcontractor of this Subcontractor, and whether any such claim, cause of action, or suit is asserted against Contractor, the owners, and/or the architects, their agents, employees and assigns or this Subcontractor severally, jointly, and/or jointly and severally.

Subcontractor will and hereby agrees to indemnify and hold harmless, Contractor, the owners, the architects, their agents, employees and assigns of and from all costs of investigation, adjustment, attorney's fees, court costs, administrative costs, and other related items or expense arising out of any claim, cause of action or suit of the kind and nature set forth in the preceding paragraph.

Subcontractor specifically declares and admits that the indemnity and hold harmless agreements contained in the two (2) preceding paragraphs apply with equal force, validity, and intent to the liabilities of Contractor, the owners, the architects, their agents and employees, and arising, existing by virtue of the provisions of the "Act providing for the protection and safety of persons in or about the construction, repairing, alteration, or removal of buildings, bridges, viaducts, and other structures, and to provide for the enforcement thereof, "Section 60 of III. Rev. Stats, Section 50 et. seq. relating to Structural Work as amended, and under such comparable statutes of the State in which the work hereunder is to be performed.

The obligations of this Subcontractor hereunder shall not extend to the liability of the architect or engineer, his agents or employees arising out of (1) the preparation or approval of maps, drawings, opinion reports, surveys, change orders, designs, or specifications, or (2) the giving of or the failure to give directions or instructions by the architect or engineer, his agents or employees provided such giving or failure to give is the primary cause of the injury or damage.

**13 GUARANTEES:**

Subcontractor guarantees to repair or replace any or all of its work which may in the opinion of the Contractor, be defective in workmanship or material within a period of 365 days from date of completion of the work, together with any damage resulting from such defect and any other adjacent work which may be displaced by such repair or replacement, without any expense whatsoever to the Contractor. In the event of its failure to comply with the aforesaid guarantee within ten (10) days after being notified in writing by the Contractor, Subcontractor does hereby authorize the Contractor to proceed to have said noncompliance remedied or said defect repaired and made good at Subcontractor's expense, and Subcontractor will honor and pay the costs and charges therefore upon demand.

**14 THE CONTRACT SUM:**

Upon satisfactory completion of all the Work and in accordance with the terms and schedule noted on the reverse, the Contractor shall pay the Subcontractor in current funds for the performance of the Work, subject to additions and deductions authorized by written Change Order signed by Contractor, the total price noted on the reverse which is inclusive of applicable taxes, licenses, permits, delivery charges, loading and unloading costs, labor, material, profit and overhead, and Subcontractor's daily clean-up expenses.

**15 CHANGES AND EXTRAS:**

The Contractor, without invalidating this Contract, may make changes by adding, adding to or deducting from the Work, and the Contract price shall be adjusted accordingly, as hereinafter provided. All such work shall be executed under conditions of the original Contract. The Contractor representative authorized to make changes or extras to the work is the President who has signed this original document. Any other authorizations are invalid and will not be honored.

Invoices for additional work will not be honored by Contractor unless such additional work has been authorized in writing by the Contractor. Time sheets, if required and a material list shall be signed daily by Contractor's superintendent and the same shall be attached to the invoice, and if not attached in proper and complete form, the invoice shall not be honored for payment.

Overtime work, if authorized in writing by the Contractor, and performed on the basis of premium wages, shall be invoiced to the Contractor at Subcontractor's cost, exclusive of profit.

**16 PROGRESS AND FINAL PAYMENTS:**

Progress payments will not be made until (1) an executed copy of this Contract has been returned to Contractor, (2) Certificates of insurance evidencing coverage required herein have been filed with the Contractor's office and accepted by the Contractor, and (3) waivers of lien and evidence of payment to material men have been submitted to and accepted by Contractor. Applications for progress payments shall be in writing, shall be submitted in accordance with the invoicing procedures, and shall conform to the payment schedule on the reverse side.

Final payment shall be due when the Work is fully completed and performed in accordance with the Contract Documents and is satisfactory to the Architect and Contractor. Subcontractor must submit to the Contractor satisfactory guarantees, warranties and certificates required by the specifications and terms of this agreement before final payment will be issued. Before issuance of the final payment, the Subcontractor, if required, shall submit evidence satisfactory to the Contractor that all payrolls, bills for materials and equipment, and all known indebtedness connected with the Subcontractor's Work has been paid, and shall submit to Contractor final waivers of lien satisfactory to Contractor.

Contractor has the right to issue checks jointly to the Subcontractor and any party to whom the Subcontractor is indebted to in connection with this contract.

**17 GENERAL:**

The Contractor and the Subcontractor for themselves, their successors, executors, administrators and assigns do hereby agree to the full performance of the covenants of this agreement.

DEPOSITION EXHIBIT
*Klausner* #9
CHF 5-27-03



# AIA DOCUMENT | A201-1997



## *General Conditions of the Contract for Construction*

### TABLE OF ARTICLES

1. GENERAL PROVISIONS

2. OWNER

3. CONTRACTOR

4. ADMINISTRATION OF THE CONTRACT

5. SUBCONTRACTORS

6. CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

7. CHANGES IN THE WORK

8. TIME

9. PAYMENTS AND COMPLETION

10. PROTECTION OF PERSONS AND PROPERTY

11. INSURANCE AND BONDS

12. UNCOVERING AND CORRECTION OF WORK

13. MISCELLANEOUS PROVISIONS

14. TERMINATION OR SUSPENSION OF THE CONTRACT

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

This document has been approved and endorsed by The Associated General Contractors of America.

*A - 23*



© 1997 A I A ®
**AIA DOCUMENT A201-1997**
GENERAL CONDITIONS
OF THE CONTRACT FOR
CONSTRUCTION

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington

**CAUTION:** *You should use an original AIA document with the AIA logo printed in red. An original assures that changes will not be obscured as may occur when documents are reproduced.*

Copyright 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1967, 1970, 1976, 1987, ©1997 by The American Institute of Architects. Fifteenth Edition. Reproduction of the material herein or substantial quotation of its provisions

accordance with the Contract Documents, the Owner may issue a written order to the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity, except to the extent required by Subparagraph 6.1.3.

## 2.4 OWNER'S RIGHT TO CARRY OUT THE WORK

**2.4.1** If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within a seven-day period after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may after such seven-day period give the Contractor a second written notice to correct such deficiencies within a three-day period. If the Contractor within such three-day period after receipt of such second notice fails to commence and continue to correct any deficiencies, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Contractor the reasonable cost of correcting such deficiencies, including Owner's expenses and compensation for the Architect's additional services made necessary by such default, neglect or failure. Such action by the Owner and amounts charged to the Contractor are both subject to prior approval of the Architect. If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to the Owner.

## ARTICLE 3  CONTRACTOR

### 3.1 GENERAL

**3.1.1** The Contractor is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Contractor" means the Contractor or the Contractor's authorized representative.

**3.1.2** The Contractor shall perform the Work in accordance with the Contract Documents.

**3.1.3** The Contractor shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Architect in the Architect's administration of the Contract, or by tests, inspections or approvals required or performed by persons other than the Contractor.

### 3.2 REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR

**3.2.1** Since the Contract Documents are complementary, before starting each portion of the Work, the Contractor shall carefully study and compare the various Drawings and other Contract Documents relative to that portion of the Work, as well as the information furnished by the Owner pursuant to Subparagraph 2.2.3, shall take field measurements of any existing conditions related to that portion of the Work and shall observe any conditions at the site affecting it. These obligations are for the purpose of facilitating construction by the Contractor and are not for the purpose of discovering errors, omissions, or inconsistencies in the Contract Documents; however, any errors, inconsistencies or omissions discovered by the Contractor shall be reported promptly to the Architect as a request for information in such form as the Architect may require.

**3.2.2** Any design errors or omissions noted by the Contractor during this review shall be reported promptly to the Architect, but it is recognized that the Contractor's review is made in the Contractor's capacity as a contractor and not as a licensed design professional unless otherwise specifically provided in the Contract Documents. The Contractor is not required to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations, but any nonconformity discovered by or made known to the Contractor shall be reported promptly to the Architect.



© 1997  A I A ®
**AIA DOCUMENT A201-1997**
GENERAL CONDITIONS
OF THE CONTRACT FOR
CONSTRUCTION

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

A-24

**3.2.3** If the Contractor believes that additional cost or time is involved because of clarifications or instructions issued by the Architect in response to the Contractor's notices or requests for information pursuant to Subparagraphs 3.2.1 and 3.2.2, the Contractor shall make Claims as provided in Subparagraphs 4.3.6 and 4.3.7. If the Contractor fails to perform the obligations of Subparagraphs 3.2.1 and 3.2.2, the Contractor shall pay such costs and damages to the Owner as would have been avoided if the Contractor had performed such obligations. The Contractor shall not be liable to the Owner or Architect for damages resulting from errors, inconsistencies or omissions in the Contract Documents or for differences between field measurements or conditions and the Contract Documents unless the Contractor recognized such error, inconsistency, omission or difference and knowingly failed to report it to the Architect.

## 3.3 SUPERVISION AND CONSTRUCTION PROCEDURES

**3.3.1** The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the Contractor shall evaluate the jobsite safety thereof and, except as stated below, shall be fully and solely responsible for the jobsite safety of such means, methods, techniques, sequences or procedures. If the Contractor determines that such means, methods, techniques, sequences or procedures may not be safe, the Contractor shall give timely written notice to the Owner and Architect and shall not proceed with that portion of the Work without further written instructions from the Architect. If the Contractor is then instructed to proceed with the required means, methods, techniques, sequences or procedures without acceptance of changes proposed by the Contractor, the Owner shall be solely responsible for any resulting loss or damage.

**3.3.2** The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors.

**3.3.3** The Contractor shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work.

## 3.4 LABOR AND MATERIALS

**3.4.1** Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

**3.4.2** The Contractor may make substitutions only with the consent of the Owner, after evaluation by the Architect and in accordance with a Change Order.

**3.4.3** The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Contract. The Contractor shall not permit employment of unfit persons or persons not skilled in tasks assigned to them.

## 3.5 WARRANTY

**3.5.1** The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract



© 1997 AIA®
**AIA DOCUMENT A201-1997**
GENERAL CONDITIONS
OF THE CONTRACT FOR
CONSTRUCTION

The American Institute
of Architects
1735 New York Avenue, N.W.

B

portion of the Work fully completed and accepted shall be submitted by the Contractor to the Architect prior to certification of such payment. Such payment shall be made under terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

**9.10.4** The making of final payment shall constitute a waiver of Claims by the Owner except those arising from:

    **.1** liens, Claims, security interests or encumbrances arising out of the Contract and unsettled;

    **.2** failure of the Work to comply with the requirements of the Contract Documents; or

    **.3** terms of special warranties required by the Contract Documents.

**9.10.5** Acceptance of final payment by the Contractor, a Subcontractor or material supplier shall constitute a waiver of claims by that payee except those previously made in writing and identified by that payee as unsettled at the time of final Application for Payment.

## ARTICLE 10 PROTECTION OF PERSONS AND PROPERTY

### 10.1 SAFETY PRECAUTIONS AND PROGRAMS

**10.1.1** The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract.

### 10.2 SAFETY OF PERSONS AND PROPERTY

**10.2.1** The Contractor shall take reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to:

    **.1** employees on the Work and other persons who may be affected thereby;

    **.2** the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Contractor or the Contractor's Subcontractors or Sub-subcontractors; and

    **.3** other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, structures and utilities not designated for removal, relocation or replacement in the course of construction.

**10.2.2** The Contractor shall give notices and comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on safety of persons or property or their protection from damage, injury or loss.

**10.2.3** The Contractor shall erect and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent sites and utilities.

**10.2.4** When use or storage of explosives or other hazardous materials or equipment or unusual methods are necessary for execution of the Work, the Contractor shall exercise utmost care and carry on such activities under supervision of properly qualified personnel.

**10.2.5** The Contractor shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Contract Documents) to property referred to in Clauses 10.2.1.2 and 10.2.1.3 caused in whole or in part by the Contractor, a Subcontractor, a Sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Contractor is responsible under Clauses 10.2.1.2 and 10.2.1.3, except damage or loss attributable to acts or omissions of the Owner or Architect or anyone directly or indirectly employed by either of them, or by anyone for whose acts either of them may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to the Contractor's obligations under Paragraph 3.18.



© 1997 A I A®
**AIA DOCUMENT A201-1997**
GENERAL CONDITIONS
OF THE CONTRACT FOR
CONSTRUCTION

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

A-26

**10.2.6** The Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Owner and Architect.

**10.2.7** The Contractor shall not load or permit any part of the construction or site to be loaded so as to endanger its safety.

### 10.3 HAZARDOUS MATERIALS

**10.3.1** If reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Contractor, the Contractor shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner and Architect in writing.

**10.3.2** The Owner shall obtain the services of a licensed laboratory to verify the presence or absence of the material or substance reported by the Contractor and, in the event such material or substance is found to be present, to verify that it has been rendered harmless. Unless otherwise required by the Contract Documents, the Owner shall furnish in writing to the Contractor and Architect the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of such material or substance or who are to perform the task of removal or safe containment of such material or substance. The Contractor and the Architect will promptly reply to the Owner in writing stating whether or not either has reasonable objection to the persons or entities proposed by the Owner. If either the Contractor or Architect has an objection to a person or entity proposed by the Owner, the Owner shall propose another to whom the Contractor and the Architect have no reasonable objection. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Contractor. The Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Contractor's reasonable additional costs of shut-down, delay and start-up, which adjustments shall be accomplished as provided in Article 7.

**10.3.3** To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Contractor, Subcontractors, Architect, Architect's consultants and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area if in fact the material or substance presents the risk of bodily injury or death as described in Subparagraph 10.3.1 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) and provided that such damage, loss or expense is not due to the sole negligence of a party seeking indemnity.

**10.4** The Owner shall not be responsible under Paragraph 10.3 for materials and substances brought to the site by the Contractor unless such materials or substances were required by the Contract Documents.

**10.5** If, without negligence on the part of the Contractor, the Contractor is held liable for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Contract Documents, the Owner shall indemnify the Contractor for all cost and expense thereby incurred.

### 10.6 EMERGENCIES

**10.6.1** In an emergency affecting safety of persons or property, the Contractor shall act, at the Contractor's discretion, to prevent threatened damage, injury or loss. Additional compensation or



© 1997 AIA®
**AIA DOCUMENT A201-1997**
GENERAL CONDITIONS
OF THE CONTRACT FOR
CONSTRUCTION

The American Institute
of Architects
1735 New York Avenue, N.W.
Washington, D.C. 20006-5292

*A-27*

MURRAY MN-NOBLES MN-PIPESTONE MN-CLAY IA-DICKINSON IA-OBRIEN IA-
OSCEOLA IA-
INCLUDING THE CITIES OF...ABERDEEN...MARSHALL...REDFIELD...
SISSETON...WATERTOWN...PIPESTONE...SLAYTON...WORTHINGTON...SPENCER...
SPIRIT LAKE

...WIND ADVISORY TODAY...
NORTHWEST WINDS FROM 20 TO 35 MPH WILL BE COMMON TODAY...WITH
OCCASIONAL GUSTS UP TO 45 MPH EXPECTED.  THE BRISK WINDS ARE
EXPECTED TO DIMINISH THIS EVENING.

$$
  HAMEN


TTAA00 KFSD 170919 COR

URGENT - WEATHER MESSAGE...CORRECTED TYPOS
NATIONAL WEATHER SERVICE SIOUX FALLS SD
313 AM CST WED MAR 17 1999

.GUSTY NORTHWEST WINDS FROM 20 TO 35 MPH...WITH GUSTS UP TO 45
MPH...WILL BE FOUND ACROSS NORTHERN AND EASTERN PORTIONS OF SOUTH
DAKOTA...SOUTHWEST MINNESOTA...NORTHWEST IOWA AND EXTREME NORTHEAST
NEBRASKA TODAY.  THE BRISK WINDS ARE IN THE WAKE OF A STRONG COLD
FRONT WHICH PUSHED THROUGH THE REGION OVERNIGHT.  THE WINDS SHOULD
SLOWLY SUBSIDE FROM WEST TO EAST THROUGH THE AFTERNOON AND EVENING
AS HIGH PRESSURE BUILDS IN FROM THE NORTHERN ROCKIES.

IF YOU HAVE TRAVEL PLANS ACROSS THE ADVISORY AREA TODAY...ESPECIALLY
IN HIGH PROFILE OR LIGHTWEIGHT VEHICLES...BE PREPARED FOR DIFFICULT
TRAVEL CONDITIONS DUE TO THE BUFFETING NORTHWEST WINDS.

SDZ001>004-009-014>016-033>040-045-048-051>056-058>062-064>071-
MNZ098-IAZ001-012-020>022-031-032-NEZ013-014-171800-
AURORA-BEADLE-BON HOMME-BROOKINGS-BUFFALO-CAMPBELL-CLAY-CORSON-
DAVISON-DEWEY-DOUGLAS-HAND-HANSON-HARDING-HUGHES-HUTCHINSON-HYDE-
JERAULD-JONES-KINGSBURY-LAKE-LINCOLN-LYMAN-MCCOOK-MINER-MINNEHAHA-
MOODY-PERKINS-POTTER-SANBORN-STANLEY-SULLEY-TURNER-UNION-WALWORTH-
YANKTON-ZIEBACH-ROCK MN-BUENA VISTA IA-CHEROKEE IA-IDA IA-LYON IA-
PLYMOUTH IA-SIOUX IA-WOODBURY IA-DAKOTA NE-DIXON NE-
INCLUDING THE CITIES OF...BISON...BROOKINGS...BUFFALO...DUPREE...
GETTYSBURG...HURON...LEMMON...MITCHELL...MOBRIDGE...MURDO...PIERRE...
SIOUX FALLS...VERMILLION...YANKTON...LUVERNE...LE MARS...ROCK
RAPIDS...SIOUX CENTER...SIOUX CITY...STORM LAKE

...WIND ADVISORY THIS MORNING...
NORTHWEST WINDS WILL BE SUSTAINED FROM 20 TO 35 MPH THROUGH THE
MORNING...WITH OCCASIONAL GUSTS UP TO 45 MPH. THE BRISK WINDS ARE
EXPECTED TO DIMINISH FROM WEST TO EAST THROUGH THE AFTERNOON AND
EVENING.

$$
SDZ005>008-010>011-017>023-MNZ071-072-080-081-089-090-097-IAZ002-003-
013-014-172200-
BROWN-CLARK-CODINGTON-DAY-DEUEL-EDMUNDS-FAULK-GRANT-HAMLIN-MARSHALL-
MCPHERSON-ROBERTS-SPINK-COTTONWOOD MN-JACKSON MN-LINCOLN MN-LYON MN-
MURRAY MN-NOBLES MN-PIPESTONE MN-CLAY IA-DICKINSON IA-OBRIEN IA-
OSCEOLA IA-

A-28

INCLUDING THE CITIES OF...ABERDEEN...MARSHALL...REDFIELD...
SISSETON...WATERTOWN...PIPESTONE...SLAYTON...WORTHINGTON...SPENCER...
SPIRIT LAKE


...WIND ADVISORY TODAY...
NORTHWEST WINDS FROM 20 TO 35 MPH WILL BE COMMON TODAY...WITH
OCCASIONAL GUSTS UP TO 45 MPH EXPECTED.  THE BRISK WINDS ARE
EXPECTED TO DIMINISH THIS EVENING.

$$
 HAMEN


TTAA00 KABR 171422

URGENT - WEATHER MESSAGE
NATIONAL WEATHER SERVICE  ABERDEEN SD
820 AM CST WED MAR 17 1999

.STRONG LOW PRESSURE WAS MOVING EASTWARD ACROSS MINNESOTA THIS
MORNING. THE COMBINATION OF THIS LOW PRESSURE SYSTEM AND HIGH
PRESSURE OVER WYOMING AND MONTANA WAS GENERATING VERY STRONG
NORTHWESTERLY WINDS ACROSS NORTHEASTERN SOUTH DAKOTA AND WEST CENTRAL
MINNESOTA.

SDZ006>008-011-018>023-172200-
BROWN-CLARK-CODINGTON-DAY-DEUEL-GRANT-HAMLIN-MARSHALL-ROBERTS-SPINK-
INCLUDING THE CITIES OF ABERDEEN...BRITTON...CASTLEWOOD...CLARK...
CLEAR LAKE...MILBANK...REDFIELD...SISSETON...WATERTOWN...WEBSTER

NORTHWEST WINDS WILL INCREASE THIS MORNING TO 45 MPH WITH OCCASIONAL
GUSTS TO 55 MPH. THESE WINDS WILL CREATE VERY HAZARDOUS CONDITIONS
FOR DRIVING AND FOR PEOPLE WORKING OUTSIDE THROUGHOUT NORTHEASTERN
SOUTH DAKOTA.
$$

GUERRERO/LORENS

TTAA00 KABR 171436 COR

URGENT - WEATHER MESSAGE...CORRECTED...
NATIONAL WEATHER SERVICE  ABERDEEN SD
835 AM CST WED MAR 17 1999

.STRONG LOW PRESSURE WAS MOVING EASTWARD ACROSS MINNESOTA THIS
MORNING. THE COMBINATION OF THIS LOW PRESSURE SYSTEM AND HIGH
PRESSURE OVER WYOMING AND MONTANA WAS GENERATING VERY STRONG
NORTHWESTERLY WINDS ACROSS NORTHEASTERN SOUTH DAKOTA AND WEST
CENTRAL
MINNESOTA.

SDZ006>008-011-018>023-172200-
BROWN-CLARK-CODINGTON-DAY-DEUEL-GRANT-HAMLIN-MARSHALL-ROBERTS-SPINK-
INCLUDING THE CITIES OF ABERDEEN...BRITTON...CASTLEWOOD...CLARK...
CLEAR LAKE...MILBANK...REDFIELD...SISSETON...WATERTOWN...WEBSTER

...HIGH WIND WARNING THROUGH THIS AFTERNOON FOR NORTHEASTERN SOUTH
DAKOTA...
NORTHWEST WINDS WILL INCREASE THIS MORNING TO 45 MPH WITH OCCASIONAL

4 - 29

**UNEDITED LOCAL CLIMATOLOGICAL DATA**
**NOAA, National Climatic Data Center | MONTH: 03/1999**

Station Location: SPENCER, IA (SPW) Lat: 43° 10', lon: -95° 12'
Elev(Ground): 1321 Feet  Time Zone:  WBAN: 14972

| Date | Temperature (Fahrenheit) Max | Min | Avg | Dep From Normal | Avg Dew pt. | Avg Wet Bulb | Deg Days base 65 Heating | Cooling | Significant Weather | Snow/Ice on Depth 0600 LST | Precip 2400 LST Water Equiv | Pressure Avg Station | Avg Sea level | Wind Res Dir | Res Speed | Avg Speed | max 5-sec Speed | Dir | max 2-min Speed | Dir |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 59 | 27 | 43 | M | 35 | 38 | 22 | 0 | FG | M | T | 28.33 | 29.80 | 26 | 6.2 | 8.1 | 21 | 30 | 18 | 30/01 |
| 2 | 42 | 32 | 37 | M | 24 | 29 | 33 | 0 | FG | M | T | 28.47 | 29.98 | 33 | 21.4 | 21.9 | 33 | 33 | 33 | 34/02 |
| 3 | 33 | 17 | 25 | M | 16 | 22 | 40 | 0 | | M | 0.00 | 28.64 | 30.16 | 35 | 5.1 | 10.0 | 29 | 34 | 0 | 0/03 |
| 4 | 32 | 25 | 29 | M | 24 | 28 | 31 | 0 | SN FG | M | | 28.42 | 29.93 | 5 | 13.4 | 13.5 | 13 | 14 | 28 | 14/04 |
| 5 | 34 | 26 | 30 | M | 24 | 30 | 36 | 0 | SN FG HZ | M | | 28.60 | 30.10 | 5 | 15.7 | 16.0 | 26 | 6 | 22 | 5/05 |
| 6 | 34 | 22 | 28 | M | 17 | 23 | 42 | 0 | SN FG HZ | M | | 28.60 | 30.52 | 2 | 7.0 | 8.9 | 22 | 1 | 18 | 1/06 |
| 7 | 29 | 22 | 25 | M | 17 | 22 | 37 | 0 | HZ | M | T | 28.97 | 30.48 | 14 | 16.2 | 16.6 | 36 | 14 | 30 | 13/07 |
| 8 | 34 | 24 | 27 | M | 23 | 25 | 38 | 0 | RA FG UP HZ | M | | 28.93 | 28.93 | 14 | 10.2 | 11.1 | 34 | 34 | 16 | 34/09 |
| 9 | 29 | 24 | 25 | M | 21 | 25 | 38 | 0 | SN FG FZFG | M | 0.02 | 28.56 | 30.08 | 15 | 10.4 | 10.9 | 18 | 11 | 8 | 8/10 |
| 10 | 31 | 13 | 22 | M | 13 | 20 | 43 | 0 | SN FG+ FG FZFG HZ | M | 0.00 | 28.89 | 30.30 | 6 | 4.1 | 4.9 | 13 | 7 | 8 | 9/11 |
| 11 | 33 | 19* | 25* | M | 14 | 23 | 46 | 0 | FG HZ | M | 0.00 | 28.87 | 30.42 | 5 | 3.8 | 5.5 | 14 | 8 | 11 | 10/12 |
| 12 | 34 | 9 | 22 | M | 16 | 20 | 43 | 0 | FG+ FG FZIG HZ | M | 0.00 | 28.80 | 30.42 | 6 | 4.1 | 5.1 | 14 | 11 | 7 | 7/13 |
| 13 | 38 | 11 | 34 | M | 21 | 33 | 40 | 0 | FG HZ | M | 0.00 | 28.67 | 30.34 | 17 | 3.9 | 5.8 | 13 | 17 | 17 | 17/14 |
| 14 | 44 | 21 | 42 | M | 26 | 41 | 31 | 0 | FG | M | 0.00 | 28.39 | 30.21 | 17 | 11.9 | 12.2 | 18 | 18 | 17 | 18/15 |
| 15 | 57 | 29 | 37 | M | 31 | 31 | 22 | 0 | FG HZ | M | 0.00 | 28.18 | 29.89 | 17 | 6.6 | 10.0 | 25 | 21 | 21 | 22/16 |
| 16 | 51 | 32 | 42 | M | 42 | 42 | 23 | 0 | | M | 0.00 | 28.41 | 30.50 | 30 | 23.4 | 24.7 | 59 | 29 | 29 | 29/17 |
| 17 | 46 | 28 | 37 | M | 25 | 31 | 28 | 0 | FG | M | 0.06 | 28.88 | 30.42 | 34 | 9.4 | 10.5 | 34 | 34 | 34 | 34/18 |
| 18 | 51 | 30 | 38 | M | 27 | 33 | 27 | 0 | | M | 0.00 | 28.87 | 30.40 | 17 | 4.9 | 5.5 | 15 | 16 | 14 | 19/19 |
| 19 | 50 | 30 | 40 | M | 24 | 35 | 25 | 0 | | M | 0.00 | 28.71 | 30.21 | 32 | 9.6 | 15.0 | 34 | 34 | 31 | 34/20 |
| 20 | 47 | 23 | 36 | M | 21 | 30 | 28 | 0 | | M | 0.00 | 28.75 | 30.26 | 36 | 9.4 | 10.4 | 26 | 35 | 35 | 35/21 |
| 21 | 49 | 23 | 36 | M | 27 | 34 | 29 | 0 | | M | 0.00 | 28.58 | 30.18 | 10 | 4.0 | 5.6 | 17 | 11 | 17 | 13/22 |
| 22 | 42 | 20 | 31 | M | 20 | 28 | 34 | 0 | | M | 0.00 | 28.66 | 30.10 | 1 | 7.9 | 9.8 | 24 | 28 | 20 | 28/23 |
| 23 | 47 | 20 | 39 | M | 18 | 28 | 26 | 0 | HZ | M | 0.00 | 28.78 | 30.31 | 11 | 11.5 | 11.9 | 35 | 35 | 35 | 2/24 |
| 24 | 58 | 24 | 41 | M | 29 | 33 | 24 | 0 | | M | 0.00 | 28.87 | 30.41 | 17 | 3.4 | 6.8 | 14 | 14 | 2 | 2/24 |
| 25 | 62 | 31 | 47 | M | 30 | 40 | 18 | 0 | | M | 0.00 | 28.87 | 30.20 | 17 | 15.1 | 15.3 | 39 | 17 | 25 | 36/25 |
| 26 | 57 | 30 | 44 | M | 31 | 41 | 21 | 0 | RA FG HZ | M | 0.08 | 28.43 | 29.92 | 27 | 22.2 | 22.4 | 47 | 17 | 17 | 17/26 |
| 27 | 64 | 32 | 47 | M | 35 | 37 | 19 | 0 | RA FG | M | 0.02 | 28.47 | 29.96 | 25 | 16.8 | 21.1 | 28 | 28 | 43 | 16/27 |
| 28 | 76* | 46 | 46 | M | 23 | 38 | 11 | 0 | | M | 0.00 | 28.70 | 30.21 | 25 | 8.6 | 10.0 | 30 | 25 | 28 | 28/28 |
| 29 | 74 | 32 | 54* | M | 36 | 46 | 3 | 0 | | M | 0.00 | 28.40 | 29.87 | 20 | 23.5 | 24.2 | 46 | 26 | 25 | 25/30 |
| 30 | | 50 | 62* | M | 47 | 53 | 3 | 0 | | M | 0.00 | 28.11 | 30.17 | 21 | 20.2 | 21.6 | 45 | 23 | 23 | 23/31 |

| | Max | Min | Avg | Dep | Dew | Wet | Heating | Cooling | | | Totals> | Station | Sea | Res | | Avg | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Monthly** | 45.6 | 23.8 | 34.7 | | 24.8 | 30.8 | 29.6 | 0 | <Monthly Averages | | 0.18 | 28.62 | 30.19 | 0.9 | 19.8 | 12.6 | <Monthly Average | | | |
| | | | 0 | | | | | | --------Departure From Normal ---------> | | 0.00 | | | | | | | | | |

**Degree Days**

| | Monthly | Season to Date |
|---|---|---|
| Heating: | 930 | -255 |
| Cooling: | 0 | 0 |

Total Departure  Total Departure
Heating: -255
Cooling:  0

Greatest 24-hr Precipitation: 0.10 Date: 27-28
Greatest 24-hr Snowfall:  date:
Greatest Snow Depth: 0  date:

**Number of Days with**

| | | |
|---|---|---|
| Max temp >= 90: 0 | Min temp <= 32: 30 | |
| Max temp <= 32: 6 | Min temp <= 0: 0 | |
| Thunderstorms: 0 | Heavy Fog: 2 | |

**Sea Level Pressure**  Date  Time
Maximum: 30.64  6  2208
Minimum: 29.47  17  0115

Precipitation >= .01 inch: 0
Precipitation >= .10 inch: 0
Snowfall >= 1.0 inch: 0

A-30

| Hr | Time/ID | Sky | Clouds | Vis | Wx | T | Td | Ta | RH | Spd | Dir | | Alt | | Site | Type |
|----|---------|-----|--------|-----|-----|-----|-----|-----|-----|-----|-----|---|------|---|------|------|
| 15 | 2253.A022 | FEW090 | | 9SM | - | 35.1 | 32 | 33.8 | 89 | 8 | 200 | 0 | 28.31 | | 074 | AA |
| 15 | 2353.A022 | FEW090 | | 10SM | - | 37 | 30.9 | 34.5 | 79 | 6 | 210 | 0 | 28.30 | 6 | 070 | AA |
| 16 | 0053.A020 | FEW090 | | 10SM | - | 37 | 32 | 34.9 | 82 | 8 | 230 | 0 | 28.30 | | 070 | AA |
| 16 | 0153.A020 | FEW090 | | 10SM | - | 37.9 | 34 | 36.3 | 86 | 10 | 240 | 0 | 28.30 | | 070 | AA |
| 16 | 0253.A020 | CLR | | 9SM | - | 37 | 33.1 | 35.4 | 86 | 7 | 240 | 0 | 28.30 | 8 | 068 | AA |
| 16 | 0353.A020 | CLR | BR | 8SM | | 35.1 | 32 | 33.8 | 89 | 7 | 270 | 0 | 28.32 | | 075 | AA |
| 16 | 0453.A020 | CLR | BR | 5SM | | 35.1 | 32 | 33.8 | 89 | 6 | 300 | 0 | 28.32 | | 077 | SP |
| 16 | 0553.A020 | CLR | BR | 4SM | | 33.1 | 30.9 | 32.2 | 92 | 5 | 300 | 0 | 28.32 | | 079 | SP |
| 16 | 0631.A030 | | BR | 2SM | | 30 | 30 | 30 | 100 | 3 | 000 | 0 | 28.32 | | | SP |
| 16 | 0653.A020 | HEW090 | BR | 2SM | | | | | | | 230 | 0 | | | 081 | SP |
| 16 | 0721.A020 | FEW090 | BR | 1 1/2SM | | 30 | 28.9 | 29.7 | 96 | 5 | 000 | 0 | 28.32 | | | SP |
| 16 | 0753.A020 | FEW090 | BR | 1 3/4SM | | | | | | | 230 | 0 | | | 081 | SP |
| 16 | 0803.A020 | FEW090 | BR | 2SM | | 33.1 | 32 | 32.7 | 96 | 5 | 000 | 0 | 28.34 | | | SP |
| 16 | 0821.A020 | FEW090 | HZ | 3SM | | | | | | | 000 | 0 | | | 085 | SP |
| 16 | 0853.A020 | FEW080 | BR | 4SM | | 37.9 | 34 | 36.3 | 86 | 0 | 060 | 0 | 28.33 | | 081 | AA |
| 16 | 0953.A020 | HEW080 | BR | 6SM | | 42.1 | 37.9 | 40.3 | 85 | 3 | 090 | 0 | 28.31 | | 074 | AA |
| 16 | 1053.A021 | FEW085 | BR | 6SM | | 46 | 39 | 42.8 | 77 | 7 | 100 | 0 | 28.29 | | 066 | AA |
| 16 | 1153.A021 | FEW080 | HZ | 7SM | | 46.9 | 39.9 | 43.7 | 80 | 11 | 120 | 0 | 28.25 | 8 | 052 | AA |
| 16 | 1253.A401 | FEW080 | | 7SM | | 51.1 | 45 | 48 | 80 | 14 | 110 | 0 | 28.21 | | 025 | AA |
| 16 | 1353.A021 | FFW075 | | 6SM | | 51.1 | 45 | 48 | 77 | 15 | 140 | G | 28.18 | | 025 | AA |
| 16 | 1453.A021 | FEW080 | | 7SM | | 54 | 46.9 | 50.4 | 75 | 13 | 130 | | 28.14 | 8 | 013 | AA |
| 16 | 1553.A021 | FEW085 | | 9SM | | 55.9 | 48 | 51.8 | 75 | 10 | 160 | G | 28.14 | 20 | 007 | AA |
| 16 | 1653.A021 | FEW085 | | 10SM | | 57 | 48.9 | 52.7 | 83 | 8 | 150 | | 28.12 | | 003 | AA |
| 16 | 1753.A021 | FEW085 | | 10SM | | 53.1 | 48 | 50.4 | 89 | 8 | 150 | G | 28.10 | 6 | 996 | AA |
| 16 | 1853.A021 | FEW090 | | 10SM | | 46.9 | 43 | 45 | 86 | 9 | 150 | | 28.10 | | 997 | AA |
| 16 | 1953.A021 | FEW090 | | 10SM | | 44.1 | 41 | 42.6 | 89 | 10 | 180 | | 28.07 | | 989 | AA |
| 16 | 2053.A022 | SCT090 | | 10SM | | 42.1 | 41 | 42.6 | 83 | 8 | 170 | | 28.06 | 8 | 985 | AA |
| 16 | 2153.A022 | FEW090 | | 10SM | | 45 | 39.9 | 42.6 | 69 | 17 | 200 | | 28.07 | | 985 | AA |
| 16 | 2253.A022 | CLR | | 10SM | | 45 | 41 | 45.7 | 71 | 15 | 210 | | 28.06 | | 980 | AA |
| 16 | 2353.A022 | CLR | | 10SM | | 51.1 | 41 | 45.7 | 77 | 19 | 210 | | 28.07 | | 983 | AA |
| 17 | 0053.A020 | FEW090 | | 10SM | | 50 | 41 | 44.6 | 82 | 18 | 240 | | 28.12 | 24 | 982 | AA |
| 17 | 0153.A020 | SCT085 | | 10SM | | 48 | 41 | 45.7 | 83 | 18 | 290 | G | 28.14 | 24 | 998 | AA |
| 17 | 0253.A020 | FEW090 | | 10SM | | 43 | 37.9 | 40.6 | 86 | 18 | 300 | G | 28.18 | | 010 | AA |
| 17 | 0353.A020 | CLR | | 10SM | | 43 | 36 | 39.9 | 86 | 18 | 300 | G | 28.21 | | 023 | AA |
| 17 | 0453.A020 | FEW085 | | 10SM | | 39.9 | 34 | 36.3 | 79 | 21 | 300 | G | 28.27 | 28 | 033 | AA |
| 17 | 0551.A020 | FEW090 FEW026 SCT085 | | 10SM | | 37.9 | 35.1 | 36.5 | 79 | 21 | 300 | G | 28.31 | 29 | 055 | AA |
| 17 | 0653.A020 | FEW095 | | 10SM | | 39 | 33.1 | 35.8 | 68 | 22 | 300 | G | 28.35 | 37 | 072 | AA |
| 17 | 0753.A020 | BKN037 | | 10SM | | 39.9 | 12 | 35.8 | 65 | 22 | 300 | G | 28.38 | | 087 | AA |
| 17 | 0833.A020 | BKN043 BKN050 OVC075 | | 10SM | | 41 | 30 | 35.8 | 65 | 31 | 290 | G | 28.40 | 41 | 097 | AA |
| 17 | 0953.A020 | BKN041 OVC050 | | 10SM | | 41 | 30.9 | 37.9 | 63 | 31 | 290 | G | 28.42 | 46 | 107 | AA |
| 17 | 1053.A021 | BKN036 OVC045 | | 10SM | | 41 | 28 | 36.5 | 58 | 38 | 300 | G | 28.45 | 44 | 110 | AA |
| 17 | 1153.A021 | SCT036 OVC043 | | 10SM | | 42.1 | 28 | 36.3 | 60 | 29 | 300 | G | 28.49 | 38 | 120 | AA |
| 17 | 1253.A021 | BKN038 | | 10SM | | 42.1 | 28.9 | 36.7 | 60 | 30 | 320 | | 28.51 | 36 | 131 | AA |
| 17 | 1351.A121 | SCT042 BKN049 | | 10SM | | 43 | 30.9 | 37.9 | 63 | 28 | 310 | G | 28.55 | 30 | 142 | AA |
| 17 | 1451.A021 | SCT055 SCT090 | | 10SM | | 43 | 30.9 | 37.9 | 63 | 28 | 310 | G | 28.59 | 23 | 156 | AA |
| 17 | 1553.A021 | HEW090 | | 10SM | | 41 | 30 | 35.4 | 65 | 28 | 300 | G | 28.63 | 28 | 172 | AA |
| 17 | 1653.A021 | FEW090 | | 10SM | | 41 | 27 | 36.5 | 57 | 23 | 300 | G | 28.64 | 34 | 184 | AA |
| 17 | 1753.A021 | FEW090 | | 10SM | | 39.9 | 28 | 35.1 | 63 | 14 | 310 | | 28.64 | 29 | 194 | AA |
| 17 | 1853.A021 | FEW090 | | 10SM | | 36 | 28 | 32.9 | 73 | 16 | 300 | | 28.67 | | 204 | AA |
| 17 | 1953.A021 | FEW090 | | 10SM | | 36 | 27 | 32.5 | 70 | 14 | 300 | | 28.69 | | 210 | AA |
| 17 | 2053.A021 | FEW090 | | 10SM | | 35.1 | 26.1 | 31.6 | 70 | 16 | 310 | | 28.71 | | 217 | AA |
| 17 | 2153.A022 | FEW090 | | 10SM | | 34 | 26.1 | 30.9 | 71 | 13 | 300 | | 28.74 | | 227 | AA |
| 17 | 2253.A022 | FEW090 | | 10SM | | 33.1 | 25 | 30.4 | 75 | 15 | 290 | | 28.77 | | 238 | AA |
| 17 | 2353.A022 | FEW090 | | 10SM | | 32 | 25 | 29.5 | 75 | 13 | 300 | | 28.78 | | 242 | AA |
| 18 | 0053.A020 | FEW090 | | 10SM | | 30.9 | 24.1 | 28.4 | 76 | 11 | 310 | | 28.81 | | 252 | AA |
| 18 | 0153.A020 | FEW090 | | 10SM | | 30.9 | 24.1 | 28.4 | 76 | 11 | 320 | | 28.81 | | 259 | AA |
| 18 | 0253.A020 | FEW090 | | 10SM | | 30 | 23 | 27.5 | 75 | 12 | 310 | | 28.83 | | 267 | AA |
| 18 | 0353.A020 | FEW090 | | 10SM | | 28.9 | 24.1 | 27.1 | 82 | 9 | 300 | | 28.87 | | 275 | AA |
| 18 | 0453.A020 | CLR | | 10SM | | 28.9 | 23 | 26.8 | 78 | 9 | 320 | | 28.89 | | 282 | AA |

A 21

**MARK W. REITZ**



**Rietz**

December 24, 2002

Mr. Steven J. Andreasen
Willia, Stahle & Andreasen, L.L.P.
Attorneys and Counsellors at Law
501 Pierce Street, Suite 400
P.O. Box 1768
Sioux City, Iowa 51102

Re: **Jim Eischeid**

Dear Mr. Andreasen:

I have reviewed the documents you provided. These included: contracts between the Owner (Pine Tree Spencer, L.L.C.) and the General Contractor (Dover Construction, Inc.); contracts between the General Contractor and their subcontractors (Woods Masonry Inc. & DeLoss Construction Incorporated); the contract drawings and specifications; Spencer, IA airport weather data from the NOAA, National Climatic Data Center; the depositions of John Derek Woods and Barry Ray DeLoss; and photos of the construction site following the wall collapse. Based upon review of these documents, review of building codes and standards, review of OSHA requirements, and calculations I have prepared. I offer the following regarding the events that took place on the job site where Mr. Eischeid was working on March 17, 1999.

1)  Both Dover Construction and Woods Masonry contractually agreed to perform their work in accordance with the drawings and the outline specifications on the drawings related to this Pine Tree Plaza project.

2)  Both Dover Construction and Woods Masonry were further required to perform their work in accordance with OSHA standards. Refer to OSHA Standards for the Construction Industry (29 CFR PART 1926) and to the subcontract agreement between Dover Construction and Woods Masonry.

3)  The drawings required the concrete block walls, including the wall that collapsed on March 17, 1999, to be braced adequately to withstand a wind load of 20 psf minimum during construction. Refer to the masonry section of the "General Structural Notes" on Drawing S103.

4)  Because the wall that collapsed on March 17, 1999 was over eight feet in height, OSHA regulations existing at the time of the project required that the wall be adequately braced to prevent failure during construction. Refer to 29 CFR PART 1926 with Amendments as of February 3, 1997, Subpart Q, Section 1926.706(b), which states, "All masonry walls over eight feet in height shall be adequately braced to prevent overturning and to prevent collapse unless the wall is adequately supported so that it will not overturn or collapse. The bracing shall remain in place until permanent supporting elements of the structure are in place." The depositions of both John Derek Woods and Barry Ray DeLoss indicate that the wall that collapsed had no bracing in place prior to or at the time of the collapse. The depositions and

Rietz Consultants, Ltd.
Consulting Engineers
2330 Lincoln Way, Suite 205
Ames, Iowa 50014,7131
Telephone 515.292.7026
Facsimile 515.292.7101
www.rietzconsultants.com

A -33

the post collapse photos document the fact that the permanent supporting elements of the structure (the roof framing and roof deck) were not in place at the time of the collapse.

5) The wall that collapsed on March 17, 1999 was not constructed in accordance with either the drawings or OSHA standards, in that the wall was not braced while it was being constructed to avoid overturning or to withstand a wind load of 20 psf minimum. My calculations show that the wall that collapsed, in its un-braced condition, would have collapsed at a wind load well below 20 psf, possibly as low as 2 to 3 psf. Refer to the calculations in Appendix 3.

6) The failure to brace the wall created a dangerous condition for any persons working on or around the wall due to the risk of collapse without such bracing.

7) A wind load of 20 psf is equivalent to a wind, perpendicular to a wall of dimensions similar to the walls at this project, with a 5-second wind gust velocity in the range of 80 to 90 mph. Refer to the graph in Appendix 1 for the relationship between wind speed and wind pressure.

8) If the wall had been constructed in accordance with OSHA standards and the drawings, it would not have collapsed on March 17, 1999. This conclusion is based upon the following:

   a) As of March 17, 1999, another wall had been completed, which formed a part of this project directly to the west of the wall that collapsed. This wall was effectively identical in dimensions as the wall that collapsed and ran parallel with the wall which collapsed. As of March 17, 1999, this west wall had been completed to its full height and length, was reinforced and grouted. and was externally braced with cable bracing attached to points on the top of the wall. This wall did not collapse on March 17, 1999.

   b) The south half of the wall that collapsed did not immediately collapse when Eischeid was injured. At the time of the injury, the south half had just been grouted. This section of wall had, due to the weight of the fresh grout that had been placed earlier in the morning, slightly more stability than the ungrouted portion to the north that failed. This is evident by the calculations in Appendix 4.

   c) A third wall on the east side of the building had also been constructed to its final height (+18'-0"), grouted to a height of approximately four feet, and was not braced. It also did not collapse at the time of Eischeid's injury. This wall was more stable than the section of wall that collapsed at the time of Eischeid's injury due to its lower final height and partial grouting. The calculations in Appendix 5 show that this wall would have likely failed under a wind from the northwest with a 5 second gust wind speed between 50 mph and 60 mph.

   d) The external bracing required by OSHA and the drawings would have provided support to the wall which collapsed no less than (in fact, such bracing would have provided more support than) the support existing for the west wall, the south half of the wall which collapsed, and the east wall.

   e) The recorded wind speeds in Spencer, Iowa on March 17, 1999 would have created wind loads less than the 20 psf minimum required by the drawings. The maximum recorded 5 second wind speed of 59 mph out of the northwest would have produced a wind pressure

of approximately 6 psf on the wall which collapsed. This pressure is approximately twice the pressure necessary to cause the wall that injured Eischeid to overturn.

Please call at your convenience to discuss these findings.

Sincerely,

RIETZ CONSULTANTS, LTD.

Marc W. Rietz, P.E.

enc

Certification:



I hereby certify that this engineering document was prepared by me or under my direct personal supervision and that I am a duly licensed Professional Engineer under the laws of the State of Iowa.

Marc W. Rietz, P.E.                           24 DEC 02
                                                    Date

License number: 13188

My license renewal date is December 31, 2002

Pages or sheets covered by this seal:
Letter, A1, A2-1, A2-2, A2-3, A3-1, A3-2, A3-3, A4-1, A4-2
A4-3, A5-1, A5-2, A5-3.

Combined Height, Exposure and Gust Factor Coefficient:

$C_{e20} := 1.13$

Pressure Coefficient:

$C_q := 1.3$

Wind Importance Factor:

$I := 1.0$

Wind Stagnation Pressure @ Standard Height of 33 Feet:

$q_s(V) := 0.00256 \cdot V^2 \cdot \dfrac{psf}{mph^2}$

Wind Pressure:

$P(C_e, V) := C_e \cdot C_q \cdot q_s(V) \cdot I$



Wind Pressure at Elevation 20 ft

Rietz Consultants, Ltd.

A-36

Appendix 1

The Uniform Building Code uses "Fastest Mile" wind speed as the basis for wind load calculation. Maximum wind speed data collected at the Spencer, IA airport is given as "Maximum 5 Second" wind speed. This table and the following graph show the relationship between "Fastest Mile" and "Maximum 5 Second" wind speeds.

| 5 Second Gust Wind Speed – V.5 (mph) | V.5 / V.3600 | Hourly Mean Wind Speed – V.3600 (mph) | Averaging time of fastest mile wind – T.fm (sec) | V.fm / V.3600 | Fastest Mile Wind Speed – V.fm (mph) |
|---|---|---|---|---|---|
| 10 | 1.48 | 6.76 | 533 | 1.06 | 7.16 |
| 20 | 1.48 | 13.51 | 266 | 1.10 | 14.86 |
| 30 | 1.48 | 20.27 | 178 | 1.13 | 22.91 |
| 40 | 1.48 | 27.03 | 133 | 1.16 | 31.35 |
| 50 | 1.48 | 33.78 | 107 | 1.18 | 39.86 |
| 60 | 1.48 | 40.54 | 89 | 1.20 | 48.65 |
| 70 | 1.48 | 47.3 | 76 | 1.22 | 57.7 |
| 80 | 1.48 | 54.05 | 67 | 1.24 | 67.03 |
| 90 | 1.48 | 60.81 | 59 | 1.26 | 76.62 |
| 100 | 1.48 | 67.57 | 53 | 1.28 | 86.49 |

This relationship is presented in a graph on the following page.

Adapted from ASCE 7-98, Figure C6-1 (See Appendix 2-3)

## Fastest Mile VS 5 Second Gust





FIGURE C6-1. Ratio of Probable Maximum Speed Averaged over $t$ s to Hourly Mean Speed

Figure taken from ASCE 7-98 Commentary, Section 6, Page 268.

**References:**

1. Standard Practice for Bracing Masonry Walls Under Construction, Council for Masonry Wall Bracing, July 2001
2. Uniform Building Code, 1991 Edition
3. Minimum Design Loads for Buildings and Other Structures, ASCE 7-98

**Assumptions:**

1. The wall was not anchored to foundation wall since grout was not in place.
2. Wall was plumb, ignore construction tolerance and wind load deflection.
3. Wind was from the northwest and the wall orientation was north-south.
4. The wall started at rough grade elevation approx. 8" below future finished floor.

**Wall System Geometry:**

Top of wall elevation...                                $H := 23.333 \cdot ft + 8 \cdot in$

Wall thickness...                                       $t := 9.625 \cdot in$

Unit face shell thickness (ASTM C90)...                 $t_f := 1.375 \cdot in$

**Material Properties:**

Compressive Strength of Concrete Masonry...             $f_i := 750 \cdot psi$
(Ref. Table 5.3.2b)

Modulus of Elasticity...                                $E := 900 \cdot f_i$
(Ref. Section 5.3.2.2)

                                                        $E = 675000\,psi$

**Material Loads:**

Masonry wall unit weight...                             $\delta_w := 52 \cdot psf$

Masonry wall weight on one foot strip...                $W_w := \delta_w \cdot H \cdot 1 \cdot ft$

                                                        $W_w = 1247.98267\,lbf$

**UBC Wind Load at Which Cracked Wall Loses Stability:**

Wind speed (fastest mile)...                            $V := 25.6 \cdot mph$
(Equivalent to a 34 mph 5 Second Gust Wind Speed)

Wind stagnation pressure...    $q_s(V) := 0.00256 \cdot psf \cdot \left( \dfrac{V}{mph} \right)^2$     $q_s(V) = 1.67772\,psf$

Combined height, exposure & gust coef...                $C_e := 1.13$

Pressure coefficient...                                 $C_q := 1.3$

Importance factor...

$I := 1$

Design wind pressure...          $P := C_e \cdot C_q \cdot q_s(V) \cdot I$

$P = 2.46457 \, psf$

Angle of the wind relative to the wall...

$\theta := 45 \cdot deg$

Pressure component perpendicular to the wall...

$P_{perp} := P \cdot \cos(\theta)$

$P_{perp} = 1.74272 \, psf$

Total wind force on one foot strip...      $F := P_{perp} \cdot H \cdot 1 \cdot ft$

$F = 41.82 \, lbf$

**Stability Analysis:**

If wall is cracked at the base, wall will overturn when Mo exceeds Mr...

Overturning moment...          $M_o := F \cdot \left( \dfrac{H}{2} \right)$

$M_o = 501.89 \, ft \cdot lbf$

Resisting moment...          $M_r := (W_w) \cdot \left( \dfrac{t}{2} \right)$

$M_r = 500.49 \, ft \cdot lbf$

**Ungrouted, Uncracked Masonry Wall Section Properties:**

Area...          $A := 2 \cdot 12 \cdot in \cdot t_f$

$A = 33 \, in^2$

Moment of inertia...          $I_x := \dfrac{1}{12} \cdot 12 \cdot in \cdot t^3 - \dfrac{1}{12} \cdot 12 \cdot in \cdot (t - 2 \cdot t_f)^3$

$I_x = 566.71484 \, in^4$

**UBC Wind Load at Cracking Moment:**

Wind speed (fastest mile)...
(Equivalent to a 38 mph 5 Second Gust Wind Speed)

$V := 28.4 \cdot mph$

Design wind pressure...          $P := C_e \cdot C_q \cdot q_s(V) \cdot I$

$P = 3.03318 \, psf$

Pressure component perpendicular to the wall...

$P_{perp} := P \cdot \cos(\theta)$

$P_{perp} = 2.14478 \, psf$

Total wind force on one foot strip...      $F := P_{perp} \cdot H \cdot 1 \cdot ft$

$F = 51.47 \, lbf$

Moment at base of wall (Cracking Moment)...      $M_c := F \cdot \dfrac{H}{2}$

$M_c = 617.68047 \, ft \cdot lbf$

**Combined stresses:**

Compressive stress...

$$\frac{W_w}{A} + \frac{M_c \cdot \frac{t}{2}}{I_x} = 100.76\,\text{psi}$$

Tensile stress...

$$\frac{W_w}{A} - \frac{M_c \cdot \frac{t}{2}}{I_x} = -25.13\,\text{psi}$$

Design Flexural Tensile Stress of Masonry...
(Ref.1, Table 5.4.3.2 - Portland Cement/Lime Type M Mortar)

$$F_m := 25 \cdot \text{psi}$$

**Conclusions:**

1.  The maximum tensile stress (as defined by Reference 1, Table 5.4.3.2) at the base of the wall is exceeded when the wind speed exceeds approximately 38 mph (5 Second Gust). A horizontal crack develops at the base of the wall when the maximum tensile stress is exceeded.

2.  Once a horizontal crack develops at the base of the wall the only force resisting overturning is the weight of the wall. This force is not adequate to keep the wall from overturning since the above stability calculations show the unrestrained wall will overturn at a wind speed of approximately 34 mph (5 Second Gust).

Appendix 4 - Wall Stability
Analysis (Grid 6 with Grout NW
Wind).mcd

Grouted Section of Wall that
Remained Standing

12/24/2002

**References:**

1. Standard Practice for Bracing Masonry Walls Under Construction, Council for Masonry Wall Bracing, July 2001
2. Uniform Building Code, 1991 Edition
3. Minimum Design Loads for Buildings and Other Structures, ASCE 7-98

**Assumptions:**

1. The wall was not anchored to foundation wall since grout had just been placed and had not set and cured. Grout adds only to the weight of the wall.
2. Wall was plumb, ignore construction tolerance and wind load deflection.
3. Wind was from the northwest and the wall orientation was north-south.
4. The wall started at rough grade elevation approx. 8" below future finished floor.

**Wall System Geometry:**

Top of wall elevation...

$$H := 23.333 \cdot ft + 8 \cdot in$$

Wall thickness...

$$t := 9.625 \cdot in$$

Unit face shell thickness (ASTM C90)...

$$t_f := 1.375 \cdot in$$

**Material Properties:**

Compressive Strength of Concrete Masonry...
(Ref. Table 5.3.2b)

$$f'_i := 750 \cdot psi$$

Modulus of Elasticity...
(Ref. Section 5.3.2.2)

$$E := 900 \cdot f'_i$$

$$E = 675000 \, psi$$

**Material Loads:**

Masonry wall unit weight...

$$\delta_w := 66 \cdot psf$$

Masonry wall weight on one foot strip...

$$W_w := \delta_w \cdot H \cdot 1 \cdot ft$$

$$W_w = 1583.978 \, lbf$$

**UBC Wind Load at Which Cracked Wall Loses Stability:**

Wind speed (fastest mile)...
(Equivalent to a 38 mph 5 Second Gust Wind Speed)

$$V := 28.8 \cdot mph$$

Wind stagnation pressure...

$$q_s(V) := 0.00256 \cdot psf \cdot \left(\frac{V}{mph}\right)^2$$

$$q_s(V) = 2.12337 \, psf$$

Combined height, exposure & gust coef...

$$C_e := 1.13$$

Pressure coefficient...

$$C_q := 1.3$$

Appendix 4 - Wall Stability
Analysis (Grid 6 with Grout NW
Wind).mcd

Grouted Section of Wall that
Remained Standing

12/24/2002

Importance factor... $\qquad$ $I := 1$

Design wind pressure... $\qquad$ $P := C_e \cdot C_q \cdot q_s(V) \cdot I$ $\qquad$ $P = 3.11923\ psf$

Angle of the wind relative to the wall... $\qquad$ $\theta := 45 \cdot deg$

Pressure component perpendiculart to the wall... $\qquad$ $P_{perp} := P \cdot \cos(\theta)$

$P_{perp} = 2.20563\ psf$

Total wind force on one foot strip... $\qquad$ $F := P_{perp} \cdot H \cdot 1 \cdot ft$ $\qquad$ $F = 52.93\ lbf$

## Stability Analysis:

If wall is cracked at the base, wall will overturn when Mo exceeds Mr...

Overturning moment... $\qquad$ $M_o := F\left(\dfrac{H}{2}\right)$ $\qquad$ $M_o = 635.2\ ft \cdot lbf$

Resisting moment... $\qquad$ $M_r := \left(W_w\right)\cdot\left(\dfrac{t}{2}\right)$ $\qquad$ $M_r = 635.24\ ft \cdot lbf$

## Ungrouted, Uncracked Masonry Wall Section Properties:

Area... $\qquad$ $A := 2 \cdot 12 \cdot in \cdot t_f$ $\qquad$ $A = 33\ in^2$

Moment of inertia... $\qquad$ $I_x := \dfrac{1}{12} \cdot 12 \cdot in \cdot t^3 - \dfrac{1}{12} \cdot 12 \cdot in \cdot \left(t - 2 \cdot t_f\right)^3$ $\qquad$ $I_x = 566.71484\ in^4$

## UBC Wind Load at Cracking Moment:

Wind speed (fastest mile)...
(Equivalent to a 39 mph 5 Second Gust Wind Speed) $\qquad$ $V := 30.6 \cdot mph$

Design wind pressure... $\qquad$ $P := C_e \cdot C_q \cdot q_s(V) \cdot I$ $\qquad$ $P = 3.52131\ psf$

Pressure component perpendicular to the wall... $\qquad$ $P_{perp} := P \cdot \cos(\theta)$

$P_{perp} = 2.48994\ psf$

Total wind force on one foot strip... $\qquad$ $F := P_{perp} \cdot H \cdot 1 \cdot ft$ $\qquad$ $F = 59.76\ lbf$

Moment at base of wall (Cracking Moment)... $\qquad$ $M_c := F \cdot \dfrac{H}{2}$ $\qquad$ $M_c = 717.08401\ ft \cdot lbf$

Appendix 4 - Wall Stability
Analysis (Grid 6 with Grout NW
Wind).mcd

Grouted Section of Wall that
Remained Standing

12/24/2002

**Combined stresses:**

Compressive stress...

$$\frac{W_w}{A} + \frac{M_c \cdot \frac{t}{2}}{I_x} = 121.07\,psi$$

Tensile stress...

$$\frac{W_w}{A} - \frac{M_c \cdot \frac{t}{2}}{I_x} = -25.07\,psi$$

Design Flexural Tensile Stress of Masonry...
(Ref.1, Table 5.4.3.2 - Portland Cement/Lime Type M Mortar)

$$F_m := 25 \cdot psi$$

**Conclusions:**

1. The maximum tensile stress (as defined by Reference 1, Table 5.4.3.2) at the base of the wall is exceeded when the wind speed exceeds approximately 39 mph (5 Second Gust). A horizontal crack develops at the base of the wall when the maximum tensile stress is exceeded.

2. Once a horizontal crack develops at the base of the wall the only force resisting overturning is the weight of the wall. This force is not adequate to keep the wall from overturning since the above stability calculations show the unrestrained wall will overturn at a wind speed of approximately 38 mph (5 Second Gust).

**References:**

1. Standard Practice for Bracing Masonry Walls Under Construction, Council for Masonry Wall Bracing, July 2001
2. Uniform Building Code, 1991 Edition
3. Minimum Design Loads for Buildings and Other Structures, ASCE 7-98

**Assumptions:**

1. The wall was anchored to foundation with grout but was ungrouted above elevation (+3'-4") per testimony by Mr. Woods.
2. Wall wa plumb, ignore construction tolerance and wind load deflection.
3. Wind is from the northwest and the wall orientation was north-south.
4. The wall started at rough grade elevation approx. 8" below future finished floor.

**Wall System Geometry:**

Top of wall (above grout)...

$$H := 18.0 \cdot ft + 8 \cdot in - 4.0 \cdot ft$$

Wall thickness...

$$t := 9.625 \cdot in$$

Unit face shell thickness (ASTM C90)...

$$t_f := 1.375 \cdot in$$

**Material Properties:**

Compressive Strength of Concrete Masonry...
(Ref. Table 5.3.2b)

$$f'_c := 750 \cdot psi$$

Modulus of Elasticity...
(Ref. Section 5.3.2.2)

$$E := 900 \cdot f'_c$$

$$E = 675000 \, psi$$

**Material Loads:**

Masonry wall unit weight above (+4'-0")...

$$\delta_w := 52 \cdot psf$$

Masonry wall weight on one foot strip above (+4'-0")...

$$W_w := \delta_w \cdot H \cdot 1 \cdot ft$$

$$W_w = 762.66667 \, lbf$$

**UBC Wind Load at Which Cracked Wall Loses Stability:**

Wind speed (fastest mile)...
(Equivalent to a 42 mph 5 Second Gust Wind Speed)

$$V := 32.7 \cdot mph$$

Wind stagnation pressure...

$$q_s(V) := 0.00256 \cdot psf \cdot \left( \frac{V}{mph} \right)^2$$

$$q_s(V) = 2.73738 \, psf$$

Combined height, exposure & gust coef...

$$C_e := 1.13$$

Pressure coefficient...

$$C_q := 1.3$$

Importance factor...

$I := 1$

Design wind pressure...

$P := C_e \cdot C_q \cdot q_s(V) \cdot I$

$P = 4.02121 \, psf$

Angle of the wind relative to the wall...

$\theta = 45 \cdot deg$

Pressure component perpendicular to the wall...

$P_{perp} := P \cdot \cos(\theta)$

$P_{perp} = 2.84343 \, psf$

Total wind force on one foot strip above (+3'-8")...

$F := P_{perp} \cdot H \cdot 1 \cdot ft$

$F = 41.7 \, lbf$

## Stability Analysis:

If wall is cracked at (+3'-8"), wall will overturn when Mo exceeds Mr...

Overturning moment...

$M_o := F \cdot \left( \dfrac{H}{2} \right)$

$M_o = 305.83 \, ft \cdot lbf$

Resisting moment...

$M_r := \left( W_w \right) \cdot \left( \dfrac{t}{2} \right)$

$M_r = 305.86 \, ft \cdot lbf$

## Ungrouted, Uncracked Masonry Wall Section Properties:

Area...

$A := 2 \cdot 12 \cdot in \cdot t_f$

$A = 33 \, in^2$

Moment of inertia...

$I_x := \dfrac{1}{12} \cdot 12 \cdot in \cdot t^3 - \dfrac{1}{12} \cdot 12 \cdot in \cdot \left( t - 2 \cdot t_1 \right)^3$

$I_x = 566.71484 \, in^4$

## UBC Wind Load at Cracking Moment:

Wind speed (fastest mile)...
(Equivalent to a 51 mph 5 Second Gust Wind Speed)

$V := 40.7 \cdot mph$

Design wind pressure...

$P := C_e \cdot C_q \cdot q_s(V) \cdot I$

$P = 6.22946 \, psf$

Pressure component perpendicular to the wall...

$P_{perp} := P \cdot \cos(\theta)$

$P_{perp} = 4.4049 \, psf$

Total wind force on one foot strip...

$F := P_{perp} \cdot H \cdot 1 \cdot ft$

$F = 64.61 \, lbf$

Moment at (+3'-8") (Cracking Moment)...

$M_c := F \cdot \dfrac{H}{2}$

$M_c = 473.77095 \, ft \cdot lbf$

**Combined stresses:**

Compressive stress...
$$\frac{W_w}{A} + \frac{M_c \cdot \frac{t}{2}}{I_x} = 71.39 \, psi$$

Tensile stress...
$$\frac{W_w}{A} - \frac{M_c \cdot \frac{t}{2}}{I_x} = -25.17 \, psi$$

Design Flexural Tensile Stress of Masonry...
(Ref.1, Table 5.4.3.2 - Portland Cement/Lime Type M Mortar)

$$F_m := 25 \cdot psi$$

**Conclusions:**

1. The maximum tensile stress (as defined by Reference 1, Table 5.4.3.2) at the top of the grout (+3'-8") is exceeded when the wind speed exceeds approximately 51 mph (5 Second Gust). A horizontal crack develops at this elevation when the maximum tensile stress is exceeded.

2. Once a horizontal crack develops at the top of the grout the only force resisting overturning is the weight of the wall. This force is not adequate to keep the wall from overturning since the above stability calculations show the upper portion of the wall will overturn at a wind speed of approximately 41 mph (5 Second Gust).

# Marc W. Rietz, PE
Principal, Structural Engineer

*Education*
Iowa State University
BS Civil Engineering
1989

*Licenses*
Iowa PE 13188
Kansas PE 15023
Wisconsin PE 34729

*Affiliations*
NSPE
ASCE
ACI

## Recent Project Experience

### Burke Corporation, Nevada, IA

*1998 Receiving & Freezer Additions*
Phase one of this project included a 9900 sf addition providing new receiving offices, receiving dock and receiving cooler. Phase two of this project included a new 5000 sf freezer addition with future blast cell capabilities.

*2001 Freezer Addition*
A new 16,100 sf addition includes expansion of an existing shipping freezer, a new refrigerated shipping dock, equipment mezzanine, and new shipping offices and welfare areas.

### City of Sioux Center, IA

*Wastewater Treatment Facility Upgrades (Completed 1998)*
Improvements included new treatment units consisting of a trickling filter, intermediate clarifier, final clarifier, gravity thickener, lift station, splitter boxes, and a sludge storage structure.

*Water Treatment Plant and East Well Field Booster/GSR (Completed 1999)*
Designed a new 1600 gpm water treatment plant and other improvements including detention tanks, gravity filters, clearwell, ground storage reservoir, and a pumping station.

### Iowa Quality Meats

*1997 Freezer Addition*
This 24,900 sf addition to IQM's Clive, Iowa meat processing facility included a 9,200 sf shipping freezer, refrigerated shipping dock, box mezzanine, and an ammonia refrigeration machinery room.

*2001 Process Expansion*
Rietz Consultants, Ltd. recently completed design for a 15,700 SF processing addition at IQM's Clive, Iowa meat processing facility. This project includes a spiral freezer, shipping freezer, cook room, cut room, ready-to-eat packaging, welfare space, maintenance office, and a refrigeration machinery room addition.

### Iowa State University

*Charles F. Frederiksen Court (Completed 2001)*
54 acre apartment style community development including 550,000 square feet of new housing, and community center with dining facilities, convenience foods, fitness center, classroom and meeting space, and business center.

*Gilman Hall System Upgrade - Phase I (Completed 2002)*
Construction included a new 5700 sf penthouse over the existing chemistry building to house two new air handlers and electrical equipment. The existing cast-in-place roof structure was reinforced to mitigate snow drift loading caused by the penthouse. Once the roof outside the penthouse, three new steel structures support stobie exhaust fans.



Rietz Consultants, Ltd.
Consulting Engineers
2300 Laxton Way, Suite 205
Ames, Iowa 50014-7131
Telephone 515.292.7026
Facsimile 515.292.7101
www.rietzconsultants.com

A-49

## Jacobson Warehouse Company

*Agricultural Chemical Distribution Center, 3001 Dixon Street, Des Moines, IA (Completed 1995)*
State-of-the-art 199,000 square foot, one story facility specifically designed for H-3 and
H-7 Hazardous Occupancies to serve as a distribution center for several major agricultural
chemical manufacturers. The facility is composed of flammable liquid storage, toxic chemical
storage, and shipping offices.

## Musco Sports Lighting

*Software Development (1990 - present)*
Developed software to provide structural design of poles and foundations for a complex array
of lighting configurations. The program generates wind loads and designs in accordance
with many different building codes and design standards including: AASHTO Standard
Specification for Structural Supports for Highway Signs, Luminaires, and Traffic Signals 1985,
1994, 2001; American National Standards Institute (ANSI) A58.1-1982, American Society of
Civil Engineers (ASCE) 7-88, 7-95, 7-98; Austrailian Standard AS1170.2-1989; British Standard
CP 3 Ch. V-2:1972, Building Officials and Code Administrators International (BOCA) 1987,
1990, 1993, 1996, 1999; International Building Code (IBC) 2000; National Building Code of
Canada (NBC) 1990, Standard Building Code (SBC) 1985, 1988, 1991, 1997; Uniform Building
Code (UBC) 1988, 1991, 1994, 1997.

## Sauer Sundstrand Company

*Manufacturing Facility, Lawrence, Kansas (Completed 1998)*
This 157,000 sf facility features a two-story, 20,000 square foot office area with a pair of
glass curtain walls on the exterior of the building and facing the plant manufacturing floor.
The structure is composed of conventional steel framing and load-bearing insulated precast
sandwich walls on spread foundations. Structural challenges included three interior bridge
cranes, and design for future expansion.

## University of Northern Iowa

*Redeker Dining Center (Completed 2001)*
A complete renovation and two additions totalling over 61,000 sf. New two story entry
additions give this existing facility a new feel. The additions were constructed utilizing
auger-cast pile and grade beam foundations, load-bearing masonry walls, and steel floor and
roof framing. Structural renovation included installation of a new freight elevator from the
basement to the second floor and new second floor framing over two interior open bays.

## Visionaire Corporation

*Aircraft Assembly Facility (Completed 1998)*
Constructed adjacent to the Ames Municipal Airport, this 124,000 square foot facility
was designed to manufacture Visionaire's composite single engine jet aircraft and serve as
corporate headquarters for the company. The complex consists of a 109,000 square foot
Airplane Assembly and Corporate Office Building, a 15,000 square foot Engine Installation
Building and plans for a future 13,000 square foot Airplane Paint Building.

$$A-50$$

**TODD SIROTIAK**

# Diversified Construction Services

P.O. Box 1584
Ames, Iowa 50014-1584

December 23, 2002


Willia, Stahle & Andreasen, L.L.P.
Attorneys And Counsellors At Law
501 Pierce Street, Suite 400
P.O. Box 1768
Sioux City, Iowa 51102


Dear Mr. Andreasen:

The following is an overview of some of the pertinent items pertaining to the project which lead to injuries suffered by Jim Eischeid on March 17, 1999:

## Contractual Obligations

1. Dover Construction, Inc. was the listed contractor of the Pine Tree plaza project located in Spenser, Iowa. As the general contractor, Dover Construction, Inc. had the obligation to "fully execute the work as described in the construction documents". This project was described as "a free standing retail facility totally approximately 42,506 s.f. which includes site work, excavation, concrete, *masonry,* structural steel, ballasted roofing system, E.F.I.S., storefront, doors, frames, hardware, drywall, acoustical ceiling, painting, fire protection, plumbing, HVAC, and electrical. Complete buildout of Staples per plans".

2. Per the contract, Dover would be responsible to complete the project in accordance with the contract documents (ex: plans, specifications, etc.) prepared by Otis Associates. Inc.

3. Based on the contract's reference to AIA Document A201-1997, Dover would be responsible for "initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract".

4. Based on common industry practices as they existed in 1999, Dover, as the General Contractor, would have the overall responsibility to maintain safety at the project site.

5. Normal construction practices would further obligate Dover, and the subcontractors, to comply with any and all applicable codes, standards, or regulatory agency, including OSHA.


## Implementation

Based on the above, the following are some items applicable in order to fulfill the project's requirements.

1. The contract documents require "Masonry shall be braced adequately to withstand a wind load of 20 psf minimum during construction" per Masonry on S103. This would include the wall which collapsed.

2. OSHA standards require "All walls over eight feet in height shall be adequately braced to prevent overturning and to prevent collapse unless the wall is adequately supported so that it

A-52

will not overturn or collapse. The bracing shall remain in place until permanent supporting elements of the structure are in place". The wall which collapsed was well beyond the eight foot height.

3. Per AIA document A201-1997 (referenced in signed Dover Construction and Pine Tree Spenser, L.L.C.) supervision and construction procedures section "If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the Contractor shall evaluate the jobsite safety thereof and, except as stated below, shall be fully and solely responsible for the jobsite safety of such means, methods, techniques, sequences or procedures". In addition, "The contractor shall be responsible to the Owner for acts and omissions of the Contractors' employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors". Furthermore, The Contractor shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work".

4. Per AIA document A201-1997 superintendent section "The Contractor shall employee a competent superintendent and necessary assistants who shall be in attendance during the Project site during performance of the Work".


Failures

Dover Construction, and their respective subcontractors, deviated from the previously described responsibilities in the following manner:

1. The wall which collapsed and caused Mr. Eischeid's injuries on March 17, 1999 was built in excess of twenty feet. Per the documents, the wall which collapsed should have been braced for a wind of 20 psf during construction. Since the wall had no bracing performed at the time of the collapse, it is apparent that this obligation was not fulfilled.

2. Failure to properly maintain a safe work environment: Based on industry standards, and the contract between Dover Construction and Pine Tree Spenser, Dover was responsible for safety at this project. Dover failed to fulfill this obligation in the following manner:

   a. As described above, the concrete wall which collapsed was constructed to its full height and length without any external bracing. Given the wall had yet to be fully grouted, reinforced, and braced per the contract documents (20 psf load), the project had walls which were in a dangerous situation to persons on and/or near their construction.

   b. Dover was required to provide supervision on the jobsite. Since the subcontractor (Woods Masonry, Inc.) continued to set the walls to the full height without bracing, Dover would have or should have known that continuance of these walls would be creating a dangerous condition. Therefore, a full height wall with no support at all would be at its maximum danger level.

   c. Customary industry practices require the general contractor to monitor conditions which would be deemed detrimental to the safety of the project. As part of this practice, weather monitoring is a portion of this normal construction task. As part of this function, Dover would have or should have known of forecasted wind conditions for their project site on March 17, 1997. Based on the unbraced condition of the walls, supervising personnel should have known of the risks associated with potential winds of 45-50 miles an hour. Furthermore, once wind increased at the actual jobsite, Dover

A-53

should have evacuated the site, or at a minimum, prohibited people from working on or near any unbraced wall.

d. It is further customary industry standards for general contractors to lead or follow up on subcontractor's safety responsibilities. Per AIA 201-1997 protection of persons and property "The Contractor shall designate a responsible member of the Contractor's organization at the site whose duty shall be the prevention of accidents. This person shall be the Contractor's superintendent unless otherwise designated by the Contractor in writing to the Owner and Architect". Therefore, it is common for the general contractor's superintendent to lead in "Tool Box" talks on current safety items. Due to the current jobsite status (mason wall risks) it would be normal to potentially discuss such an item at their "Tool Box" talk. In addition, it could be also customary for the general to confirm that other subcontractors not attending the general's "Tool Box" talk are properly performing a subcontractor's "Tool Box" talk.

e. Per the referenced AIA document, and industry standards, Dover would be "responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work". Dover would have or should have known that allowing the wall to be continued in height without the properly designed bracing (20 psf) in place was in derivation of this requirement.

## Cause of Eischeid's Injuries

Dover had significant involvement in the project's accident which caused Jim Eischeid's injuries. This conclusion can be logically reached based on the following points:

1. If the contract block had been adequately braced per the contract documents (20 psf), it is our opinion that it would have not collapsed on March 17, 1997.

   a. This is based partly on the fact that the proposed bracing strength (20 psf) equates to wind speeds significantly beyond the previously mentioned forecasted speeds of 45-50 miles and hour.

   b. Other walls on this project were subjected to the same or similar wind forces and survived.

      i. The south half of the wall (which had only been freshly grouted) initially survived the same wind force which collapsed the north portion that caused Mr. Eischeid's injuries. Since the south wall withstood the initial force in its condition, it would be logical to conclude that with the required bracing, the other portions of the walls would have had significantly more support than fresh grout alone, and therefore, also survived.

      ii. A wall which was previously erected and of near height, etc. on the west side (parallel to collapsed wall) of this project did not collapse. This wall which was grouted, reinforced, and had some external cable bracing survived the same or similar wind conditions as the wall which collapsed. Therefore, had the wall which collapsed were properly braced it would have survived.

      iii. A wall on the east end of the project (also parallel to the collapsed wall) did not collapse even though it was only partially grouted (reported approximately four feet in height). Obviously the identified bracing requirements (20 psf) would have provided significantly more support to the wall than partial grouting alone, and it survived the wind encountered at the project site.

A-54

2.  If Dover would had properly monitored the project site this incident would not have occurred. Based on forecasted conditions, actual jobsite conditions (wind conditions, unbraced wall heights, etc.), Dover should have elected to evacuate the jobsite thereby getting all parties (Jim Eischeid included) out of an obviously dangerous jobsite condition.

Based on the above information, it is our professional opinion that Mr. Eischeid's injuries would have been avoided had Dover Construction and their subcontractors fulfilled their obligations.

If there are any questions on the above information, or if we can be of any further assistance, please contact our office.

Sincerely,

Todd L. Sirotiak PE, CCE, CPC

A-55

# VITA

## PERSONAL DATA

**Name:** Todd L. Sirotiak
**Address:** 474 Town Engineering, Iowa State University, Ames, Iowa 50011
**Voice:** 515-294-5424   **Fax:** 515-294-3845   **email:** sirotiak@iastate.edu
**Home:** Ames, Iowa 50010
**Birth Year/Place:** Des Moines, Iowa      **Citizenship:** USA
**Original Year of Employment:** 2000      **Faculty Status:** Adjunct Assistant Professor
**Professional Registration:** Iowa      **ISU Number:**

## EDUCATION

MS- Iowa State University, 1997
BS- Iowa State University, 1983

## ACADEMIC EXPERIENCE

Temporary Professor, Construction Engineering Curriculum, Department of Civil and
   Construction Engineering, Iowa State University, Ames, Iowa, 2000-2001
Adjunct Assistant Professor, Construction Engineering Curriculum, Department of Civil and
   Construction Engineering, Iowa State University, Ames, Iowa, 2001-Present
Teaching Assistant, Iowa State University, Ames, Iowa, 1992-1993

## INDUSTRIAL AND OTHER NON-ACADEMIC EXPERIENCE

President, DCS, Ames, Iowa, 2000-present
Sr. PM, DiCarlo Construction Co., Kansas City, Missouri, 2000-2001
VP/Division Operations Manager, Taylor Ball, Des Moines, Iowa, 1999-2000
Sr. PM/GM, C. Iber & Sons, Peoria, Illinois, 1986-1992
Project Manager/Estimator, KS&K Corp., Ames, Iowa, 1983-1985

## ACADEMIC AREAS OF SPECIALIZATION

**Teaching**

Iowa State University

ConE 322, Construction Equipment and Heavy Construction Materials, Fall 2000, Spring 2001
ConE 441, Construction Scheduling, Spring 2001
ConE 461, Senior Capstone Design, Fall 2001, Spring 2002, Fall 02
CE    502, Construction Project Engineering and Management, Fall 02

**Research**

Construction *administration* improvement for construction
- Data collection and reporting
- Inspection and construction administration

Construction *process* improvement for construction
- Safety enhancement
- Design Build/LS/GMC
  - Value analysis engineering techniques/design implementation
  - Data collection techniques and implementation
  - Cost projections and financial planning
- Process simulation
- Tracking

## PROFESSIONAL ACTIVITIES

### Professional Society Offices and Committees

Master Builders of Iowa
  Informational Technology
  Higher Education
American Society of Civil Engineers
Masonry Institute of Iowa
Unicon
Carpenters Pension Trust Fund
American Concrete Institute
  National
  Local
Prestressed Concrete Institute
Association for the Advancement of Cost Engineers
Certified Professional Constructor
American Society for Engineering Education
American Institute of Constructors

### Consulting

Construction Cost Engineering, Jim Stecker, President Stecker-Harmsen, Ames, Iowa, 2001

## UNIVERSITY ACTIVITIES

### University Committees

### College Committees
Coop Education, Internship Task Force

**Department Committees**

Iowa State University

Construction Engineering Curriculum Committee, 2001-present
Computer Committee, 1993
Coop and Intern, 2002
ASC, 2002

**Faculty Advisor for Student Societies, Clubs, and Other Activities**

AGC Student Chapter, 2001 to present
DBIA Student Chapter, 2001 to present

A-58

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF IOWA
 2                       WESTERN DIVISION

 3   JAMES EISCHEID,                  ) CASE NO. C 00-4100-MWB
                                      )
 4            Plaintiff,              )
                                      )
 5   vs.                             )
                                      )
 6   DOVER CONSTRUCTION, INC.,        )
     WOODS MASONRY, INC.; AND         )
 7   OTIS, KOGLIN, WILSON             )        ORIGINAL
     ARCHITECTS, INC., f/k/a          )
 8   OTIS ASSOCIATES, INC.,           )
                                      )
 9            Defendants.             )
                                      )
10   and                             )
                                      )
11   DOVER CONSTRUCTION, INC.,        )
                                      )
12        Third-Party Plaintiff,      )
                                      )
13   vs.                             )
                                      )
14   WOODS MASONRY, INC.,             )
                                      )
15        Third-Party Defendant.      )
     _____)
16   WOODS MASONRY, INC.              )
                                      )
17        Third-Party Plaintiff,      )
                                      )
18   vs.                             )
                                      )
19   DELOSS CONSTRUCTION, INC.,       )
     of Spencer, Iowa,                )
20                                    )
          Third-Party Defendant.      )
21   _____)

22

23   --------------------------------------------------------

             DEPOSITION OF JOHN DEREK WOODS
24   --------------------------------------------------------

25                    ORIGINAL
```

1     Q.   I believe the front of the store would have

2  been here on the north side (indicating)?

3     A.   Okay, yes.  Yes.

4     Q.   And with blue, could you outline the wall

5  which collapsed on March 17th of '99?

6     A.   (Complying.)

7     Q.   And for the record, have you indicated --

8            MR. WILLIA:  Take this black and make it

9  thick.

10           MR. ANDREASEN:  Go ahead and go over that

11  with a thick line.

12           THE WITNESS:  (Complying.)

13           MR. WILLIA:  Identify what he's doing for

14  the record.

15           MR ANDREASEN:  And for the record,

16  Mr. Woods, have you just outlined in thicker black

17  marker the wall which collapsed on March 17, '99?

18           THE WITNESS:  Yes.

19     Q.   And again, at the time of the collapse was

20  there any bracing in place on this wall?

21     A.   Not -- not permanently in place, no.

22     Q.   And when you say not permanently in place,

23  does that mean there was no cable attached to the wall

24  which collapsed?

25     A.   No, there was cable attached to the wall.

1    Q.    Where was cable attached to the wall?

2    A.    Two or three places right here (indicating).

3    Q.    Would you mark with an arrow places on

4  Exhibit Number 1 where cable was attached to the

5  wall.?

6    A.    (Complying).

7    Q.    Could you put arrows at those dots?

8    A.    (Complying.)

9    Q.    And for the record, Mr. Woods, am I correct

10  in stating that you have put three dots on Exhibit

11  Number 1 with arrows pointing to those dots?

12    A.    Yes.

13    Q.    Have you done that for us?  And that those

14  dots represent the places on the wall where cable was

15  attached to?

16    A.    Yes.

17    Q.    At the time of the collapse was that cable

18  attached to the ground?

19    A.    No.

20    Q.    So at the time of the collapse that cable

21  was providing no support to the wall?

22    A.    That's correct.

23    Q.    And so I am correct, up until the day of the

24  collapse there had been no other bracing in place on

25  this wall that collapsed?

1      A.   No.

2           MR. WILLIA:   No, what?   You're not correct

3   or --

4           MR. ANDREASEN:   So I am correct?   Well,

5   strike that.

6           Up until the day of the collapse, other than

7   the cable bracing that you have mentioned which was

8   not connected, was there any other bracing applied to

9   that wall?

10          THE WITNESS:   No.

11     Q.   Mr. Woods, with respect to this Staples

12  office store project and the wall which collapsed,

13  when did personnel from Woods Masonry first start

14  constructing that wall?

15     A.   I don't recollect.

16     Q.   If it collapsed on March 17th of '99,

17  approximately how many days before that collapse did

18  personnel from Woods Masonry begin construction on

19  that wall?

20     A.   I don't recollect the -- (Witness shaking

21  head.)

22     Q.   And, again, we're referring to the wall

23  which collapsed as depicted in Exhibit Number 1 and as

24  shaded in Exhibit Number 2, approximately how many

25  days before March 17th of '99 --

1   on March 17th, and the entire wall number one did not

2   collapse on March 17th, is it safe to say that if wall

3   number five had been completely grouted and cable

4   braced as of March 16, 1999, that it would not have

5   collapsed on March 17, 1999?

6           MR. EARLY: Objection. Form, foundation.

7   Go ahead, if you can answer.

8           THE WITNESS: Answer it?

9           MR. EARLY: Yeah, go ahead.

10          THE WITNESS: Yes.

11          MR. ANDREASEN: Would you read that question

12  back and answer?

13          (At this time the requested portion of the

14  record was read back.)

15          MR. EARLY: Go off the record for a second.

16                          * * *

17          (At this time an off-the-record discussion

18  was held and a lunch recess was taken from 12:10 to

19  12:45 p.m. Mr. John Gray did not return after the

20  lunch recess.)

21                          * * *

22          (Mr. Avery was allowed to ask his

23  cross-examination out of turn at this time.)

24          COURT REPORTER: I'll remind you you're

25  still under oath.

1  going to be grouted until March 17th of '99?

2      A.    No.

3      Q.    You didn't know that?

4      A.    No.

5      Q.    You would have known at least as of your

6  altercation on March 16th with Barry DeLoss --

7      A.    Yes.

8      Q.    -- that wall number five was not going to be

9  grouted?

10     A.    Yes.

11     Q.    And Dover would have known as of March 16th

12 when you spoke with Dave Cozza that Barry DeLoss was

13 not going to grout wall number five?

14     A.    Yes.

15     Q.    And again, it's my understanding that the

16 bracing is installed in order to provide stability to

17 the wall?

18     A.    Yes.

19     Q.    And that stability is there to prevent it

20 from collapsing under forces such as wind?

21     A.    To help it.

22     Q.    That's the purpose of the bracing?

23     A.    Yes.

24     Q.    And the grouting that is poured in the cores

25 of the block also provides stability to the wall?

1     A.   Yes.

2     Q.   And we know that the higher the wall is, the

3 less stable it is?

4     A.   Yes.

5     Q.   So with respect to wall number five, it

6 would be at its least stable condition when it is

7 built to its top height and full length before

8 grouting occurs?

9     A.   Yes.

10    Q.   And when it is built to its full height and

11 full length without grouting, it is most susceptible

12 to forces such as wind?

13    A.   Yes.

14    Q.   And when it's built to its complete height

15 and complete length without grout, you run the

16 greatest risk of it collapsing under forces such as

17 wind?

18    A.   Yes.

19    MR. EARLY:  Objection.  Ask that my

20 objection precede the answer.  Foundation.

21    MR. ANDREASEN:  And would you agree with me

22 that a wall that is at risk of collapsing is a danger

23 to those working around the wall?

24    THE WITNESS:  Yes.

25    MR. ANDREASEN:  I apologize.  I need to take

1     Q.   And we know that OSHA standards applied to

2  the construction of this wall number five?

3     A.   Yes.

4     Q.   Do you know what the OSHA standards were as

5  of March of 1999 concerning bracing of concrete block

6  walls during construction?

7     A.   I don't recall.

8     Q.   Did you know at the time in March of '99

9  what the OSHA standards were for bracing concrete

10  block walls?

11     A.   I don't recall.

12     Q.   So when you agreed to do this project and

13  agreed to be bound by the OSHA standards for your

14  construction work, you didn't know what the OSHA

15  standards were concerning bracing of concrete block

16  walls such as wall number five?

17         MR. EARLY:  Objection.  Form and foundation.

18         THE WITNESS:  Not that -- I get to answer?

19         MR. ANDREASEN:  You can answer.

20         MR. EARLY:  Yeah.

21         THE WITNESS:  I didn't have all the exact

22  OSHA law, no.  Exact -- (Witness shaking head.)  I

23  couldn't repeat it out to you.

24         MR. ANDREASEN:  At the time that you did

25  this construction project and were constructing

1  wall number five, did you know what the OSHA standards

2  were that applied to your construction of wall number

3  five?

4        THE WITNESS:  Not that -- not exactly, no.

5  Changes all the time.

6        Q.   As of March of 1999 what was your general

7  understanding as to what the OSHA standards required

8  for bracing concrete block walls, such as wall number

9  five?

10       A.   Just needed to be adequately braced.

11       Q.   And was it your understanding that the OSHA

12  standards required bracing for any concrete block

13  walls that exceeded eight foot in height?

14       A.   No.

15       Q.   That was not your understanding?

16       A.   No.

17       Q.   So is it your testimony that the OSHA

18  standards as of March 17th of 1999 did not require

19  concrete block walls over eight feet in height to be

20  braced?

21       A.   Not that I knew of.

22       Q.   And was it your understanding that OSHA

23  standards did require concrete block walls to be

24  adequately braced?

25       A.   Yes.

1    Q.   Was it your understanding that OSHA

2    standards required concrete block walls such as wall

3    number five to be adequately braced during

4    construction?

5        A.   With temporary bracing.

6        Q.   So it was your understanding that OSHA

7    standards required at least temporary bracing to

8    provide adequate support for concrete block walls

9    during construction?

10       A.   Yes.

11       Q.   And we know that wall number five prior to

12   March 17th of 1999 did not have any of the internal

13   supports such as grout and rebar, did it?

14       A.   Correct.

15       Q.   And we know that prior to March 17th, 1999,

16   wall number five did not have any type of bracing?

17       A.   Correct.

18       Q.   So as of March 17, 1999, wall number five

19   did not comply with the OSHA standards as you

20   understood them to be?

21       A.   Correct.

22       Q.   That is correct?

23       A.   Yes.

24       Q.   As of March of 1999 when you were

25   constructing wall number five, were you familiar with

1  number five?

2          THE WITNESS:   This was after the accident.
3  They brought something out.

4      Q.   Who brought something out?

5      A.   Dover.

6      Q.   And what did they bring out?

7      A.   That it had to be and I should have braced
8  it up to a certain wind load.

9      Q.   And they were referring to the blueprints?

10     A.   Yes.

11     Q.   Did they also indicate to you that you had
12 not braced it according to that wind load requirement
13 prior to its collapse?

14     A.   No.

15     Q.   No, they did not tell that you or did they
16 tell you that it had not complied with that wind load?

17     A.   No, they did not tell me that.

18     Q.   But for some reason they pointed out to you
19 that the blueprints required for you brace wall number
20 five to some minimum wind load?

21     A.   No.

22     Q.   What was the exact conversation then after
23 the collapse that you had with Dover Construction
24 regarding the blueprint requirement?

25     A.   To put some extra bracing on the existing

1   walls.

2      Q.   And why did they tell you to put extra

3   bracing on the existing walls?

4      A.   Because they didn't think it was adequate.

5      Q.   Those were the other walls?

6      A.   Yes.

7      Q.   Would that include wall number one?

8      A.   Yes.

9      Q.   So even wall number one, which had been

10  grouted and cable braced, persons from Dover indicated

11  to you it wasn't adequate according to the blueprints?

12     A.   Yes.

13     Q.   And we know that wall number five wasn't

14  even grouted and cable braced at the time of its

15  collapse?

16     A.   Correct.

17     Q.   After the collapse, did you follow Dover's

18  instructions to provide extra bracing to the existing

19  walls?

20     A.   Yes.

21     Q.   What additional bracing did you provide to

22  the existing walls?

23     A.   Just tilted some wood up against it.

24     Q.   And you did that in order to provide more

25  support to those existing walls?

1      A.    I think it was just for looks. (Witness
2   nodding head.)

3      Q.    But you were instructed to provide more
4   bracing for the walls?

5      A.    Yes.

6      Q.    And the bracing is to provide more support
7   to the walls?

8      A.    You can say that.  (Witness nodding head.)

9      Q.    Well, it is, isn't it?

10     A.    I don't believe so.

11     Q.    Bracing provides support --

12     A.    Not wood.  Not wood.

13     Q.    Excuse me.  Bracing provides support to
14  concrete --

15     A.    Any --

16     Q.    Excuse me.  Bracing provides support to
17  concrete block walls, doesn't it?

18     A.    Yes.

19          (At this time an off-the-record discussion
20  was held.)

21          MR. ANDREASEN:  After the collapse when you
22  had this conversation with Dover, what all walls did
23  they instruct you to install additional bracing for?

24          THE WITNESS:  The two walls on the front.

25     Q.    Which two walls on the front?

1      A.    Maybe.  He didn't want the bracing to be on
2   then.  He wanted it later.

3      Q.    How did he specify when he wanted bracing on
4   the north walls?

5      A.    We put the cable on and then he wanted --
6   after we moved the scaffold he wanted some more
7   bracing down lower.

8      Q.    And is that what he specifically told you
9   about three weeks after wall number five collapsed?

10     A.    Yes.

11     Q.    He told you that for the north walls you
12  should wait until after they have been grouted and
13  cable braced and then put wood bracing on the walls,
14  as well?

15     A.    Yes.

16     Q.    And did Dave Cozza tell you why those north
17  walls needed wood bracing in addition to the cable
18  bracing?

19     A.    They were expecting high winds coming from
20  the south.

21     Q.    Did he tell you when they were expecting
22  high winds?

23     A.    That day or the next day.

24     Q.    Did he indicate that the wood bracing could
25  be removed after that day that they were expecting

1  high winds?

2      A.    No.

3      Q.    He wanted the wood bracing to stay there

4  until the walls were connected to the structural part

5  of the building?

6      A.    He didn't say that, but I assumed that.

7      Q.    He didn't tell you to take the wood bracing

8  down after the day that they were expecting the high

9  winds?

10     A.    No.

11     Q.    Wall number one after wall number five

12 collapsed had already been grouted and cable braced?

13     A.    Yes.

14     Q.    When you had this conversation with Dave

15 Cozza three weeks after wall number five collapsed,

16 did he tell you to add wood bracing to wall number

17 one?

18     A.    No.

19     Q.    After wall number five collapsed, did you or

20 anybody from Woods Masonry put wood bracing on wall

21 number one?

22     A.    I don't recall.

23     Q.    Did you ever return to the job site after

24 wall number five collapsed?

25     A.    Yes.

1      A.   Yes.

2      Q.   And it had wood bracing?

3      A.   Yes.

4      Q.   And it was connected to both wall number

5  five and wall number one by this corner method that

6  you described earlier?

7      A.   Yes.

8      Q.   And did wall number eight suffer any damage

9  on the day that wall number six fell down?

10     A.   No.

11     Q.   At the time that wall number five collapsed

12  on March 17, 1999, do you know whether it complied

13  with the bracing requirements indicated in the

14  blueprints?

15     A.   No.

16     Q.   You do not know?

17     A.   It did not, I believe.

18     Q.   It did not -- as of March 17, 1999, wall

19  number five did not comply with the bracing

20  requirements of the blueprints, did it?

21     A.   No.

22     Q.   And based upon your prior testimony, it's my

23  understanding that as of March of 1999 that there were

24  customary practices in the masonry industry concerning

25  bracing of concrete block walls?

1    A.    Yes.

2    Q.    And those customary practices required some

3  form of bracing of concrete block walls in order to

4  help stabilize those concrete block walls?

5    A.    Yes.

6    Q.    According to the customary practices in the

7  masonry industry that existed in March of 1999, should

8  wall number five have been braced before allowing

9  workers to work on it?

10    A.    Possibly.

11    Q.    Well, you were aware of what the customary

12  practices were as of March of '99, weren't you?

13    A.    That varies where you're at, I guess, for

14  customary.

15    Q.    Would the customary practices for this job

16  in Spencer, Iowa, as of March of '99 have required

17  wall number five to be braced before allowing workers

18  to work on that wall?

19    A.    Possibly.

20    Q.    And why do you say possibly?

21    A.    What's customary?

22    Q.    I'm asking you, according to the customary

23  practices as you understood them in March of '99, was

24  wall number five required to be braced as of March 17,

25  1999, in order to allow workers to work on it?

1     A.   Yes.

2     Q.   And as of March 17, 1999, when there were

3  workers, including Jim Eischeid, working on wall

4  number five, it was not braced, was it?

5     A.   No.

6     Q.   So as of March 17, 1999, when Jim Eischeid

7  was working on wall number five, wall number five did

8  not comply with the customary practices that existed

9  in March of '99 for constructing a concrete block

10  wall?

11     A.   No.

12     Q.   Am I correct?

13     A.   Yeah.  Yes.

14     (At this time an off-the-record discussion

15  was held.)

16     MR. ANDREASEN:  Looking back at March 17,

17  '99, if you had known that the winds were going to be

18  sufficient to cause wall number five to collapse, what

19  would you have done differently?

20     THE WITNESS:  I would have braced the wall

21  the day before.

22     Q.   And how would you have braced it the day

23  before?

24     A.   I would have probably grouted the wall and

25  braced it from the top.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| JAMES EISCHEID, | ) CASE NO. C00-4100-MWB |
| Plaintiff, | ) |
| vs. | ) |
| DOVER CONSTRUCTION, INC.,<br>WOODS MASONRY, INC.; AND<br>OTIS, KOGLIN, WILSON<br>ARCHITECTS, INC., f/k/a<br>OTIS ASSOCIATES, INC., | ) |
| Defendants. | ) |
| and | ) |
| DOVER CONSTRUCTION, INC., | ) |
| Third-Party Plaintiff, | ) |
| vs. | ) |
| WOODS MASONRY, INC., | ) |
| Third-Party Defendant. | ) |
| WOODS MASONRY, INC. | ) |
| Third-Party Plaintiff, | ) |
| vs. | ) |
| DELOSS CONSTRUCTION, INC.,<br>of Spencer, Iowa, | ) |
| Third-Party Defendant. | ) |

ORIGINAL

---
DEPOSITION OF BARRY RAY DELOSS
---

1       MR. SUING:  Let's do it, shall we?

2       MR. EARLY:  Sure.

3                        * * *

4       (At this time a recess was taken from

5  12:05 p.m. to 12:51 p.m.)

6                        * * *

7       MR. ANDREASEN:  Mr. DeLoss, you had earlier

8  testified that in your opinion wall number three when

9  it was at its complete height and ungrouted and

10  unbraced was in a dangerous condition.  Do you

11  remember that?

12       THE WITNESS:  Yes.

13       Q.   Would you agree also that on March 17th of

14  1999 wall number five which had been completed to its

15  full height and full length without any bracing and

16  without grout was also in a dangerous condition?

17       A.   Yes.  Yeah.

18       Q.   That would have been dangerous for any

19  workers working around the wall?

20       A.   We were worried.  We were twenty feet to the

21  west of it.

22       Q.   When you say we, that's you and your

23  employees?

24       A.   (Witness nodding head.)  And my employees.

25       Q.   And you were working where alongside that

1        A.    Yeah, that's all I can remember of the

2   conversation.  It was a very short conversation.

3        Q.    What else specifically did Derek Woods say

4   to you during that conversation about the wind

5   warnings?

6        A.    Nothing.  It was just conversation.  He come

7   walking by and I said something to him.  He walked

8   away and that was the end of it.

9        Q.    And the weather report that you had heard,

10  they were anticipating how high of winds for March 17?

11       A.    Said forty-five to fifty with higher gusts.

12            MR. WILLIA:  What?

13            THE WITNESS:  With higher gusts.

14            MR. WILLIA:  With higher gusts over fifty?

15            THE WITNESS:  Yeah, forty-five to fifty mile

16  an hour wind.  They said higher gusts and it hit

17  sixty.

18            MR. ANDREASEN:  So on the day before, the

19  weather report was indicating that on March 17th there

20  was going to be regular winds of forty-five to fifty

21  miles an hour --

22            THE WITNESS:  With gusts.

23       Q.    -- with gusts that would exceed fifty miles

24  an hour?

25       A.    Yep.

1    Q.   And you told Derek Woods on March 16th about
2  this weather report?

3    A.   Yeah.  I just -- he come walking by and I
4  said something to him about it and yeah, okay.

5    Q.   And he told you that he had heard that same
6  report and was aware that they were expecting wind of
7  forty-five to --

8    A.   He said I know.  I don't know if he actually
9  knew it or not, but -- (Witness shrugging.)  We had
10  very few conversations.

11    Q.   What exactly did Derek Woods say to you when
12  you told him that they were expecting forty-five to
13  fifty mile an hour winds with even higher gusts for
14  March 17th?

15    A.   Well, I think the only comment was, I know.
16  That's -- that's -- I know it or something like that.

17    Q.   With respect to the work that DeLoss
18  Construction --

19         (At this time an off-the-record discussion
20  was held.)

21         MR. ANDREASEN:  On March 16th, why did you
22  tell Derek Woods about these anticipated winds of
23  forty-five to fifty miles an hour with even higher
24  gusts?

25         THE WITNESS:  Because we were pouring a wall

1   next day twenty feet from it.

2   Q.   So --

3   A.   I was concerned.

4   Q.   The fact that there was going to be high

5   winds the next day, and that wall number five was

6   ungrouted and unbraced caused you even more concern?

7   A.   The main thing, it wasn't braced.  Grout

8   wouldn't have stopped it.  Bracing would.

9   (At this time an off-the-record discussion

10  was held.)

11  MR. ANDREASEN:  How did you find out about

12  the anticipated winds for March 17th?

13  THE WITNESS:  I watch The Weather Channel

14  every morning.  I listen to KICD weather and I watch

15  Channel 4 weather, then I make my own forecasts.

16  Q.   So at some time during the day on March 16th

17  you'd heard several weather reports?

18  A.   Every morning I'd watch the weather.  I

19  don't listen to it during the day.

20  Q.   And on March 16th you watched the weather

21  and they were already warning on the morning of

22  March 16th that March 17th was expecting the winds of

23  forty-five to fifty miles an hour with even higher

24  gusts?

25  A.   Yep.

1    Q.   So you were there around 7:00 working back
2  by this loading dock area?

3    A.   Right.

4    Q.   And that included the two employees, as
5  well?

6    A.   Yes.

7    Q.   Do you recall about what time of the day the
8  Woods Masonry employees arrived?

9    A.   I don't know.  We were there pouring when
10 they showed up.

11   Q.   So you had been there for a little while
12 before Woods Masonry folks --

13   A.   A little while, yeah.

14        (At this time an off-the-record discussion
15 was held.)

16        MR. ANDREASEN:  Now you've mentioned before
17 that the winds that you got on March 17th, 1999 to
18 your knowledge were in the sixty miles an hour --

19        THE WITNESS:  Well, if I remember, it was
20 forty-five to fifty was the wind and they had gusts
21 above sixty.

22   Q.   So the wind that occurred at the job site on
23 March 17th, 1999, was consistent with what the weather
24 report told you the day before?

25   A.   Pretty close.

1     Q.   In fact, if it was gusts of about sixty and

2   winds forty-five to fifty, that's exactly what the

3   weather report indicated to you the day before?

4     A.   Yeah, what makes it double bad is you got a

5   wall there that's stopping the wind, but it's got to

6   go somewhere on this wall, so it comes around the

7   wall, actually picks up the velocity of the wind when

8   it comes around another wall because you funnel into

9   it, just like going between two of these buildings

10   down here (indicating).

11     Q.   And the wind that you had on March 17th,

12   '99, of the forty-five to fifty mile an hour and

13   gusts of sixty, is consistent with the winds that you

14   warned Derek Woods about the day before?

15     A.   Yes, sir.  The forecast was for.

16     Q.   At this job site did you ever have any

17   conversations or meetings with Dover concerning safety

18   at the job site?

19     A.   I don't believe we did.

20     Q.   In any of your conversations with Dover

21   Construction concerning this project, was there ever

22   anything mentioned about safety?

23     A.   No.

24     Q.   During any of your conversations with Dover

25   concerning this project was there ever anything said

1    Derek Woods when he returned to the job site after

2    March 17th of '99?

3        A.   Oh, we probably talked about how lucky

4    nobody got killed.

5        Q.   Did you talk to him about what could have

6    been done to prevent the wall from collapsing?

7        A.   Oh, everybody knows what could have been

8    done.  He knows.

9        Q.   What is that?

10       A.   Brace it.

11       Q.   So if he would have braced it, it would have

12    prevented it from collapsing?

13       A.   Yes.

14          MR. EARLY:  Objection, foundation.

15          MR. ANDREASEN:  After March 17th --

16          MR. LUNDBERG:  Well, just a minute.  Did we

17    have an answer to that question?

18          MR. ANDREASEN:  Yes.

19          COURT REPORTER:  He said, "Yes."

20          MR. ANDREASEN:  After March 17th of 1999 did

21    you ever have any conversations with Jim Eischeid?

22          THE WITNESS:  Just briefly.  Nothing

23    specific.

24       Q.   And what types of things did you discuss

25    with Jim Eischeid after March 17th?

1     Q.   Is that correct, though, that you added

2  bracing?

3     A.   Yes, I put more bracing than I normally

4  would because of the forecast.

5     Q.   And what kind of bracing did you put on your

6  poured concrete wall?

7     A.   Well, we have two-by-six whalers on the form

8  to keep the form straight and use two-by-four kickers

9  or two-by-sixes to the ground and you steel stake them

10  in the ground.

11     Q.   These are wood braces --

12     A.   Yeah, they're only that far out of the

13  ground (indicating).

14     Q.   -- that you're putting up against the forms

15  that were set up to pour the concrete?

16     A.   Right.  Right.

17     Q.   Other than that, were there any discussions

18  from Woods or Dover about taking extra precautions for

19  the anticipated high winds of March 17th of '99?

20     A.   No.  They were blowing at 6:00 in the

21  morning already.  That morning it was already blowing.

22     Q.   As of 6:00 it was already blowing?

23     A.   It was up twenty, twenty-five by then.

24     Q.   And when -- 7:00 when you arrived at the job

25  site was it blowing then?

1      A.   Oh, yeah, it was kicking the dirt around

2  pretty good.

3      Q.   Was it increasing in speed from 6:00 to

4  7:00?

5      A.   Oh, yes.  Noticeably.

6      Q.   And as you were at the job site from 7:00

7  until 9:00 did it continue to increase in speed?

8      A.   Oh, yes.  Gusty, steady wind with gusts.

9  (Witness shaking head.)

10     Q.   So you were having high steady winds with

11  even higher gusts as early as 6:00 the morning of

12  March 17th of '99?

13     A.   It just kept building.  (Witness nodding

14  head.)  It maxed out about noon, I think it got about

15  the highest.

16     Q.   And was it consistently building up stronger

17  and stronger up until the point that wall number five

18  collapsed?

19     A.   Yeah, it got stronger after that.

20     Q.   And continued to get stronger after that?

21     A.   Um-hum.

22     Q.   So again, the wind consistently built up in

23  speed from 6:00 in the morning up until the time that

24  the wall collapsed?

25     A.   Yes.

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF IOWA
 2                      WESTERN DIVISION

 3   JAMES EISCHEID,                 )  CASE NO. C00-4100-MWB
                                     )
 4              Plaintiff,           )
                                     )
 5   vs.                             )
                                     )
 6   DOVER CONSTRUCTION, INC.,       )
     WOODS MASONRY, INC.; AND        )
 7   OTIS, KOGLIN, WILSON            )
     ARCHITECTS, INC., f/k/a         )
 8   OTIS ASSOCIATES, INC.,          )
                                     )
 9              Defendants.          )
                                     )
10   and                            )
                                     )
11   DOVER CONSTRUCTION, INC.,       )
                                     )
12        Third-Party Plaintiff,     )
                                     )
13   vs.                             )
                                     )
14   WOODS MASONRY, INC.,            )
                                     )
15        Third-Party Defendant.     )
     _____)
16   WOODS MASONRY, INC.             )
                                     )
17        Third-Party Plaintiff,     )
                                     )
18   vs.                             )
                                     )
19   DELOSS CONSTRUCTION, INC.,      )
     of Spencer, Iowa,               )
20                                   )
          Third-Party Defendant.     )
21   _____)

22

23   _____

          DEPOSITION OF KEVIN WILLIAM KLAUSNER
24   _____

25
```

ORIGINAL

1  Tree with respect to this Spencer, Iowa project?

2          THE WITNESS:  Yes, it was.

3      Q.   So am I correct then that Dover pursuant to

4  the contract was responsible to follow the provisions

5  of AIA Document A201-1997?

6      A.   That is correct.

7      Q.   In looking at Exhibit Number 9, does Exhibit

8  Number 9 appear to be AIA Document -- strike that.

9          Does Exhibit Number 9 appear to be a copy of

10  AIA Document A201-1997?

11      A.   Yes, it does.

12      Q.   So as part of this Spencer, Iowa project

13  Dover would have been responsible for the provisions

14  that are contained within Exhibit Number 9 related to

15  the contractor?

16      A.   Correct.

17          (At this time Mr. Gray returned to the

18  room.)

19          MR. ANDREASEN:  In particular, Mr. Klausner,

20  in turning to Article 3.3.1 of Exhibit Number 9 on

21  page 13.

22          THE WITNESS:  Which article again?

23      Q.   3.3.1.

24      A.   Okay.

25      Q.   Is it correct that Dover Construction for

1   this Spencer, Iowa project was solely responsible for

2   and had control over construction means, methods,

3   techniques, sequences and procedures and for

4   coordinating all portions of the work under the

5   contract?

6       A.    That's correct.

7       Q.    Is it also correct that for this Spencer,

8   Iowa project Dover Construction under Article 3.3.2

9   was responsible for the acts and omissions of its

10  subcontractors?

11      A.    Yes.    That's what it reads.

12      Q.    And that was something that was made part of

13  the contract that you signed on behalf of Dover;

14  correct?

15      A.    Correct.

16      Q.    And turning to page 34 of Exhibit Number 9.

17      A.    (Complying).

18      Q.    Under Article 10.1.1 is it also correct that

19  for this Spencer, Iowa project Dover Construction was

20  responsible for initiating, maintaining, and

21  supervising all safety precautions and programs in

22  connection with the performance of the contract?

23      A.    Between the owner and the general

24  contractor, yes.    Subcontractors were also responsible

25  for their safety programs as stated in the contract.

1   been identified that wall number five on Exhibit

2   Number 2 is the wall that collapsed on March 17th of

3   1999. To the best of your knowledge, does that seem

4   correct?

5       A.    That's correct.

6       Q.    It's also been testified to that wall number

7   five, the block had been laid to its complete height

8   of at least twenty feet and complete length of

9   approximately one hundred feet as of some time at the

10  latest on March 16th of 1999 and at that time there

11  was no grouting and no bracing to wall number five.

12          Would you agree with me, Mr. Klausner, that

13  wall number five in that state with no grout and no

14  bracing at its complete height and complete length is

15  at its least stable condition?

16      A.    Most likely, yes.

17      Q.    And would you agree that at that stage wall

18  number five was at its greatest risk of collapsing due

19  to forces such as wind?

20      A.    Probably, yeah.

21      Q.    And would you agree that at that stage with

22  no bracing, no grout, complete height and complete

23  length that wall number five was at its most dangerous

24  condition for those persons working on it?

25      A.    Yes.

1      Q.    And that would be due to the risk of it

2   collapsing under forces such as wind?

3      A.    Sure.   (Nodding head.)

4      Q.    To your knowledge, did the construction of

5   wall number five to its complete height, complete

6   length, with no bracing comply with the OSHA bracing

7   requirements?

8      A.    I'd have to, yeah, say yes.  Agree with it.

9      Q.    Read back the question.

10     A.    I'm -- sorry about that.

11          (At this time the requested portion of the

12   record was read back.)

13          THE WITNESS:  Oh, I'm sorry.  No, it did not

14   then.

15          MR. ANDREASEN:  And Dover was required by

16   the contract to comply with OSHA regulations;

17   correct?

18          THE WITNESS:  Yes, we were.

19     Q.    To your knowledge, did the construction of

20   wall number five to its complete height and complete

21   length with no bracing comply with the bracing

22   requirements of the plan drawings, specifically

23   sheet S103 of Exhibit Number 6?

24     A.    Did it comply?  I'm sorry?

25     Q.    (Counsel nodding head.)

1    A.    It appears not.

2    Q.    So to your knowledge it did not comply with

3  the bracing requirements that are included in the plan

4  drawings?

5    A.    No.

6    Q.    And again, Dover Construction was required

7  by the contract to perform the work in accordance with

8  those plan drawings, wasn't it?

9    A.    That's correct.

10    Q.    And I understand you were not in Spencer,

11  Iowa on March 17th of '99?

12    A.    That's correct.

13    Q.    So you have no firsthand knowledge of what

14  the wind conditions were at the site on March 17th of

15  '99?

16    A.    That's correct.

17    Q.    Even though you don't have firsthand

18  knowledge do you have any knowledge as you sit here

19  today as to what the wind conditions were on

20  March 17th of '99 at this Spencer project?

21    A.    From what I understand there was variable

22  winds on that day, and I got a call in the late

23  afternoon that the wind had blown it down due to a

24  microburst, so some strong winds came along and blew

25  the wall down and that two fellows were hurt.

1  winds.  I know it was -- there was some wind that day,

2  yes.

3      Q.    Did they say whether or not it was cloudy or

4  stormy that day?

5      A.    No, I don't recall on that.

6      Q.    So to the best of your knowledge, it wasn't

7  storming that day?

8      A.    To the best of my knowledge it was not

9  storming that day.

10     Q.    Did they indicate that whether this wind was

11  a straight wind or some type of tornado or upward,

12  downward type of wind?

13     A.    I don't -- don't remember if they indicated

14  what type of wind it was.

15     Q.    Given the fact that wall number five was at

16  its complete height and complete length with no

17  bracing on March 17th of '99, would you agree that

18  winds up to thirty-five miles an hour with gusts up to

19  forty-five miles an hour would create a risk of

20  collapsing that wall number five?

21     A.    Sure.  (Witness nodding head.)

22     Q.    And given this risk, if winds were expected

23  up to thirty-five miles an hour with gusts up to

24  forty-five miles an hour, would you agree with me that

25  workers should not have been working on wall number

1   five?

2      A.   To my knowledge, yes.

3      Q.   So you would agree --

4      A.   Agree, yes.

5      Q.   -- that if winds were expected up to

6   thirty-five miles an hour with gusts up to forty-five

7   miles an hour nobody should have been working on wall

8   number five in its condition as of March 17th of '99?

9      A.   Yes.  If they were expected to be at that

10   speed, I would have hoped that they would not be

11   working on the wall.

12      Q.   And given your answer then, if winds were

13   expected up to thirty-five miles an hour with gusts up

14   to forty-five miles an hour on March 17th, would you

15   have expected Dave Cozza to evacuate the job site and

16   not let those workers work on wall number five on

17   March 17th?

18      A.   Yes.

19      Q.   And, in fact, that's something that Dover

20   was responsible to do under the contract and

21   AIA Document A201-1997?

22      A.   Um-hum.

23      Q.   Is that correct?

24      A.   Correct.

25      Q.   After March 17th of '99 did anyone from

1          MR. LUNDBERG: Let's take a couple minutes.

2          (At this time a recess was taken from

3 10:42 a.m. to 10:50 a.m.)

4          MR. ANDREASEN: Mr. Klausner, you had

5 testified earlier that given the condition of wall

6 number five as of March 17th of '99 if winds were

7 expected up to thirty-five miles an hour with gusts up

8 to forty-five miles an hour, you would have expected

9 Dave Cozza to evacuate the job site or at least not

10 let any workers work on wall number five; is that

11 correct?

12          THE WITNESS: Yes. If the winds were

13 expected, if we had knowledge of that, I would hope

14 that he would tell the guys to go home, yes.

15        Q. And is that answer your expectation that he

16 would tell the workers to go home, is that consistent

17 with what the customary practices would have been for

18 general contractors at the time of this Spencer, Iowa

19 project?

20        A. For general, yes. Depending on the trade,

21 like the masons, if they were on the wall they would

22 be in danger. If there was some guys working on the

23 ground doing certain trades that may be away from the

24 walls or whatever, then they wouldn't need to go home.

25        Q. But with respect to the expected danger to

1  the masonry workers who were working on the wall, Dave

2  Cozza deciding to evacuate the job site or having

3  those workers not work on wall number five would be

4  consistent with what the customary practices were for

5  general contractors at the time of this Spencer, Iowa

6  project?

7       A.    Yes.   Yeah.

8            THE WITNESS:   I have nothing further.   Thank

9  you.

10  (10:52 a.m.)              * * *

11                    CROSS-EXAMINATION

12       BY MR. EARLY:

13       Q.   I just have a few follow-up questions for

14  you, Mr. Klausner.  My name is Matt Early and I'm here

15  today representing Woods Masonry.

16       A.    Okay.

17       Q.    Just to follow up, was there any

18  precipitating event leading to your buy out of Barry

19  Herring from Dover?

20       A.    Not to my knowledge.   It just -- we're still

21  good friends.  We were best of friends before and we

22  still are now.

23       Q.    So nothing related to this lawsuit or

24  anything that caused the split of up --

25       A.    Not to my knowledge, no.

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF IOWA
 2                       WESTERN DIVISION

 3   JAMES EISCHEID,                    )   CASE NO. C00-4100-MWB
                                        )
 4              Plaintiff,              )
                                        )
 5   vs.                                )
                                        )
 6   DOVER CONSTRUCTION, INC.,          )
     WOODS MASONRY, INC.; AND           )
 7   OTIS, KOGLIN, WILSON               )
     ARCHITECTS, INC., f/k/a            )
 8   OTIS ASSOCIATES, INC.,             )
                                        )
 9              Defendants.             )
                                        )
10   and                               )
                                        )
11   DOVER CONSTRUCTION, INC.,          )
                                        )
12        Third-Party Plaintiff,       )
                                        )
13   vs.                                )
                                        )
14   WOODS MASONRY, INC.,               )
                                        )
15        Third-Party Defendant.       )
     _____)
16   WOODS MASONRY, INC.               )
                                        )
17        Third-Party Plaintiff,       )
                                        )
18   vs.                                )
                                        )
19   DELOSS CONSTRUCTION, INC.,         )
     of Spencer, Iowa,                  )
20                                      )
          Third-Party Defendant.       )
21   _____)

22

23   ------------------------------------------------------

24        TELEPHONIC DEPOSITION OF DAVID EDWARD COZZA
     ------------------------------------------------------

25
```

ORIGINAL

1  those walls to be braced in some form during

2  construction?

3    A.    That is correct.

4    Q.    As of the Spencer, Iowa project, you were

5  aware that the customary practices in the industry

6  would require bracing of concrete block walls that

7  would reach a height of 20 feet?

8    A.    Repeat that, please.

9    Q.    I'll let the Court Reporter do it.

10   A.    All right.

11         (At this time the requested portion of the

12  record was read back.)

13         THE WITNESS:  Yes.

14         MR. ANDREASEN:  And would you agree with me

15  that the importance of that bracing is to add

16  stability to that concrete block wall?

17         THE WITNESS:  Yes, I would agree with you.

18   Q.    Would you also agree with me that that

19  bracing according to customary practices would be done

20  while the wall was being built as opposed to after it

21  reached a full height of 20 feet?

22   A.    I would certainly agree with you.

23   Q.    And would you also agree with me that the

24  importance of that bracing is also to provide safety

25  for those who are working around the wall?

1      A.    I agree with you.

2      Q.    At the time of this Spencer, Iowa project

3  did you have any knowledge or experience regarding

4  weather conditions?

5      A.    Such as frost?  Wind?

6      Q.    Well, let me strike that question.

7      A.    Okay.

8      Q.    At the time of this Spencer, Iowa project

9  did you consider yourself an expert on weather

10  conditions?

11     A.    No, I did not.

12     Q.    So at the time of this Spencer, Iowa project

13  you had no expertise as to sky conditions in

14  determining clouds and types of clouds?

15     A.    That is correct.  That is correct.

16     Q.    And am I also correct in stating that at the

17  time of this Spencer, Iowa project then that you had

18  no expertise in determining types of winds and wind

19  speeds?

20     A.    Well, I -- well, you -- you are correct

21  there.  But can I add something or is this --

22     Q.    Sure.

23     A.    Okay.  I had asked Woods Masonry in there

24  what type of wind if it gets so high would he not be

25  able to work under.  That I did check on every day.

1  March 15th, a Monday.

2      Q.   And where is it noted on your daily log for

3  March 15th of '99 that you had had a -- Oh, strike

4  that.

5           Do you recall what your meeting was about on

6  March 15th of '99?

7      A.   No, I do not.  I don't remember what it was.

8      Q.   Do you recall who you would have met with on

9  March 15th of '99?

10     A.   Yes, I do.  I would have met with the masons

11 on the job.

12     Q.   That would have been Woods Masonry?

13     A.   That's correct.  There were three

14 bricklayers and three laborers on the job.

15     Q.   To your knowledge on March 15th, 1999 when

16 you had this safety meeting with Woods Masonry, did

17 you at any time discuss the bracing that was being

18 done on the exterior concrete block walls?

19     A.   I always told them that the walls had to be

20 braced.  They always put it in my head that you had

21 these cables and we had to use those brace uprights,

22 you know, lumber uprights to keep the walls safe.  So

23 I'm sure that was part -- that's everyday procedure I

24 did that with them.

25     Q.   Is it your testimony then, Mr. Cozza, that

1  the cable either side to hold it intact to keep it

2  from shifting with the wind.

3      Q.  And I understand that that's your memory of

4  what they usually did.  But do you know as you sit

5  here today whether that was done to wall number 5

6  before it collapsed on March 17th --

7      A.  I cannot honestly say.  I don't remember.

8      Q.  So you don't know for certain whether wall

9  number 5 was ever supported by any bracing prior to

10  its collapse on March 17th of '99?

11      A.  That's correct.

12      Q.  All right.  But you would agree with me that

13  wall number 5 --  Strike that.

14          You would agree with me, though, Mr. Cozza,

15  wouldn't you, that wall number 5 would be required to

16  be braced by OSHA regulations at the time of this

17  project?

18      A.  Yes, I do agree with you.

19      Q.  And those OSHA regulations would require

20  that it be braced while it is being constructed as

21  opposed to after it reached its full height and

22  length?

23      A.  I would agree with you, yes.

24      Q.  And the customary practices would also

25  require bracing to be done while it's being

1   constructed; correct?

2      A.   That is correct, yes.

3      Q.   And the contract plans required wall

4   number 5 to be braced while it was being constructed

5   at this project, didn't it?

6      A.   That is correct.

7      Q.   Other than having these conversations with

8   Derek Woods, what, if anything, did Dover do to make

9   certain that the bracing of the exterior concrete

10  block walls at this project complied with the OSHA

11  standards?

12     A.   I know that I complained to Dan about them

13  being nonchalant about bracing and he sent them a

14  letter.  I do not have a copy of any letters at this

15  time.

16     Q.   And do you recall when you spoke to Dan

17  Nelson about that?

18     A.   Prior to the wall collapsing, of course.

19     Q.   Do you know how many days before the wall

20  collapsed?

21     A.   I would say a week or so before that.  As

22  the wall -- as the walls were getting going up, there

23  was continuing arguing between DeLoss -- DeLoss and

24  Woods about the bracing.

25          And DeLoss would be constantly coming to me

1   to going over probably stuff for the plumbing.  And I

2   know there was -- there was a couple bricklayers on

3   the wall and they were doing some -- I believe they

4   were grouting the wall and I believe that he wanted to

5   top it off, he being Barry -- not Barry, excuse me,

6   Woods.  And he was doing something to the bracing

7   because the winds were real high that day.

8        Q.   So when you arrived at the job site, the

9   winds were already very high?

10       A.   There were gusts, yes.  There were gusts.  I

11  would say it was a constant wind of 20 and there were

12  gusts of 30 and I don't remember how -- I know they

13  were higher, but I don't remember which they were.

14            But I remember he wasn't going to stay long

15  on the job.  He was going to get down.  I do remember

16  that.  He said that because it was dangerous up there

17  and I do remember that.

18       Q.   And it's your testimony that Derek Woods

19  told you on March 17th of '99 before this wall

20  collapsed that he was going to get off the job site?

21       A.   I do remember he said if it got any worse he

22  wasn't going to work there because he only had a

23  skeleton crew on the job.  I do remember that.

24            And I think they were -- they were grouting

25  that day.  I think they were stabilizing the wall.

1  believe Barry DeLoss was --

2      A.   No, I believe that was -- would have been
3  Derek Woods.  DeLoss would not have been on that -- on
4  that wall.  He may have been stabilizing something
5  else, his forms or something, but I think he was
6  pouring concrete in the back.  I don't remember at the
7  time.

8      Q.   And based upon your conversations with Dan
9  Nelson before this project even started then, would
10  you agree that the wind that was blowing on March 17th
11  of '99 up until the time that the wall collapsed was
12  not unexpected for Spencer, Iowa?

13     A.   Well, you know, in my belief, I have not
14  heard -- I've heard of 20 mile an hour winds, 25.
15  I've never seen wind, like, blowing, like, 50 miles an
16  hour or something like that.

17          I mean, I do not know if it was a common
18  occurrence in Spencer, Iowa.  I do know that it was
19  open space and there was nothing there to stop the
20  wind from the west.  Because it's all farmland to the
21  west.

22     Q.   Otherwise, you would agree that the wind was
23  already blowing pretty strong when you got at the site
24  with gusts and that the wind and the gusts
25  consistently and steadily increased from the time that

1  you got at the site up until the wall collapsed and

2  then continued to blow and increase until at least

3  noon of that day?

4      A.   I would believe so, yes.

5      Q.   Do you recall what the sky conditions were

6  in the morning of March 17th, '99 before the wall

7  collapsed?

8      A.   No, I do not.

9      Q.   If you look at your daily log, you indicate

10  there that the a.m. it was clear?

11      A.   Okay.

12      Q.   Do you see that?

13      A.   Yeah, I see that.

14      Q.   Would that indicate or am I correct then

15  that the skies were clear during the morning of

16  March 17th of '99?

17      A.   Yes.  I also indicated it was very windy

18  that day too and there's a black mark across, I don't

19  know what it is.  A stripe or a strip of something.  I

20  can't read what it says after that.

21      Q.   Do you know what that says or do you recall

22  what you wrote on March 17th of '99 in your daily log?

23      A.   I can see it in front of me.

24      Q.   I know.  Can you tell me what's covered up

25  by that black strip?

1     A.    Pardon me?

2     Q.    Mr. Cozza, if the wall were not braced on

3 March 17th of '99 and you were expecting winds up to

4 35 miles an hour with gusts up to 45 miles an hour,

5 would you agree that you would not have allowed any

6 workers to work on that wall?

7     A.    Correct.

8     Q.    And would that be for the safety of those

9 persons?

10     A.    That would be correct.

11     Q.    And you said before that you listened to the

12 radio every morning.  Do you recall what the weather

13 reports were for March 17th before you arrived at the

14 job site?

15     A.    I don't remember word-for-word but I do

16 remember they said it was gusts of 20, 25 miles an

17 hour.  I don't remember any more than that, but it

18 certainly got worse than that as we went down through

19 the day.

20     Q.    Do you recall that there was a wind advisory

21 or the Spencer area in the morning of March 17th of

22 '99 for winds of 20 to 35 miles an hour with gusts up

23 to 45 miles per hour?

24     A.    I don't remember the exact miles per hour.

25 I do remember there was a wind advisory and I advised

1  Woods of that, yes.

2    Q.  So when you arrived at the job site in the

3  morning on March 17th of '99 you were aware that there

4  was a wind advisory for that area?

5    A.  Yes.

6    Q.  And if the records would show that that wind

7  advisory was for winds of 20 to 35 miles per hour with

8  gusts up to 45 miles per hour, would you have any

9  reason to disagree with it?

10   A.  No.

11   Q.  And that would have been a wind advisory

12 that you would have heard before arriving at the job

13 site on March 17th of '99; correct?

14   A.  If it came across the radio, I would have

15 heard that, yes.

16   Q.  And you do recall hearing a wind advisory

17 before you reached the job site?

18   A.  I do -- well, I don't recall hearing it

19 called a wind advisory.  I do remember hearing gusts

20 of wind, you know, that day, yes.

21   Q.  All right.  Did you actually see the wall

22 collapse on March 17th of '99?

23   A.  I did not.

24   Q.  When did you first realize that the wall had

25 collapsed?

1  that's all I remember.

2     Q.   All right.  Now, it's my understanding that

3  on this March 17th that in addition to the south half

4  of wall number 5 remaining standing that wall number 3

5  also remained standing; is that correct?

6     A.   I believe so, yes.

7     Q.   In fact, none of the other walls at the site

8  collapsed on March 17th, did they?

9     A.   No.  That's correct.

10    Q.   And in this matter, both Barry DeLoss and

11  Derek Woods have testified that they believe if wall

12  number 5 had been braced in accordance with OSHA and

13  the plan specs that it would not have collapsed on

14  March 17th of '99, would you agree with that?

15    A.   I would agree with what they're saying,

16  yes.  Yes.  Reluctantly, because I think that was

17  Woods' responsibility to brace the wall.

18    Q.   I understand that.

19    A.   Okay.

20    Q.   But am I correct then that you believe if

21  the wall had been braced properly on March 17th of '99

22  that it would not have collapsed in this wind?

23    A.   I believe that, yes.

24    Q.   To your knowledge was the collapse of this

25  wall investigated by any government agency, such as

1   would come in later. Like, their days would start not
2   at 7:00, their days might start at 9:00, you know.
3   And that's about it.

4          And then the grouting procedures. You know,
5   I'd say, you know -- you know, he was always a
6   high lift grout guy. Do you know what I mean? He
7   would get so high and then grout it.

8          And but I'd always have to remind him to
9   brace, brace, brace. You know, to tighten up the
10  braces and that kind of thing.

11     Q.   So he was a proponent of high lift grouting,
12  is that what you're telling me?

13     A.   That's what I'm saying, yes.

14     Q.   Isn't that, in fact, what the specs called
15  for in the plan drawings?

16     A.   You're exactly right.

17     Q.   Okay. And as I understand it, you were not
18  present during the construction of walls 1 and 2? Or
19  were you?

20     A.   I don't remember, sir. I don't remember the
21  procedure. Some of the walls were up when I got there
22  and I -- God, I wish I had my photos -- there is some
23  photos I can't -- I don't know who's got the photos,
24  if anybody. But I do know the work had started prior
25  to me getting there.